(No. 60857.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JAMES HARRIS, Appellant.

*Opinion filed June 19, 1989.—Modified on denial of rehearing September 29, 1989.*

RYAN, J., joined by MILLER, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, Robert E. Davison, First Assistant Appellate Defender, and James E. Chadd, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield, and Richard M. Daley, State's Attorney, of Chicago (Mark L. Rotert, Assistant Attorney General, of Chicago, and Joan S. Cherry, Timothy W. Heath, Thomas V. Gainer, Jr., Inge Fryklund and Kevin Sweeney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CLARK delivered the opinion of the court:

Defendant, James Harris, was charged by indictment in the circuit court of Cook County with four counts of murder (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a)(1) through (a)(3)), two counts of armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 18—2(a)), four counts of aggravated kidnapping (Ill. Rev. Stat. 1981, ch. 38, pars. 10—2(a)(3), (a)(5)), one count of unlawful use of weapons (Ill. Rev. Stat. 1981, ch. 38, pars. 24—1(a)(4), (b)), one count of attempted murder (Ill. Rev. Stat. 1981, ch. 38, par. 8—4), two counts of aggravated battery (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a)), and four counts of armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2). All of these charges stemmed from his alleged involvement in an incident during which Theresa Woods was wounded and Jesse James, Sr., killed. Prior to trial, all of the kidnapping, armed violence, and weapons counts were dis-

missed. Before the case was submitted to the jury, the State withdrew, without objection, the armed robbery counts and substituted three counts of attempted armed robbery (Ill. Rev. Stat. 1981, ch. 38, par. 8—4). The jury found defendant guilty of the murder of Jesse James, Sr. (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(a)(1)), the attempted murder of Theresa Woods (Ill. Rev. Stat. 1981, ch. 38, par. 8—4), the aggravated battery of Theresa Woods (Ill. Rev. Stat. 1981, ch. 38, par. 12—4(a)), and the attempted armed robbery of Theresa Woods and Jesse James, Sr. (Ill. Rev. Stat. 1981, ch. 38, par. 8—4).

Defendant waived a jury for the death sentencing hearing. The trial court found defendant eligible for the death penalty based on the presence of the statutory aggravating factor that the murder had been committed during the course of an attempted armed robbery (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6)). The trial court also found no mitigating circumstances sufficient to preclude the imposition of the death penalty. It sentenced defendant to die by lethal injection for the murder of Jesse James, Sr. Defendant was also sentenced to terms of 15 years for each of the attempted armed robbery convictions, the terms to run concurrently, and 30 years on the attempted murder conviction, the term to run consecutively to the terms for the attempted armed robbery convictions. Because the death penalty had been imposed, defendant appealed directly to this court pursuant to Rule 603 (107 Ill. 2d R. 603).

Defendant challenged his convictions on various grounds, which can be grouped under four headings. He claimed that he was denied a fair trial because of (1) the prosecutor's use of peremptory challenges to exclude blacks from the jury; (2) the prosecution's alleged failure to disclose exculpatory material to the defense; (3) the ineffective assistance of counsel; and (4) the prosecutor's allegedly prejudicial remarks in summation. Defendant's

various challenges to his sentence can be grouped· under two headings. Defendant claimed that his sentence must be reversed because of (1) various errors claimed in connection with the trial court's consideration of evidence, presented at the aggravation-mitigation stage of the death penalty hearing, that the defendant killed a person in 1969, a charge that had been dismissed upon the State's motion of *nolle prosequi,* and (2) the alleged unconstitutionality of the Illinois death penalty act.

While defendant's appeal was pending, the United States Supreme Court held in *Batson v. Kentucky* (1986), 476 U.S. 79, 96, 90 L. Ed. 2d 69, 87, 106 S. Ct. 1712, 1722-23, "that a defendant may establish a *prima facie* case of purposeful discrimination in selection of the petit jury solely on evidence concerning the prosecutor's exercise of peremptory challenges at the defendant's trial." The Court subsequently held that the rule announced in *Batson* applied retroactively to all cases that had been pending on direct review at the time *Batson* was decided. (*Griffith v. Kentucky* (1987), 479 U.S. 314, 328, 93 L. Ed. 2d 649, 661, 107 S. Ct. 708, 716.) We therefore issued a supervisory order retaining jurisdiction of this case but remanding it to the trial court for a hearing to determine whether the State used peremptory challenges to unconstitutionally exclude blacks from the jury. At the hearing, the trial court determined that defendant established a *prima facie* case of discrimination. However, the court concluded that the State presented neutral, nonracial reasons for its use of peremptory challenges, thereby rebutting defendant's *prima facie* case. Upon return of the case to this court, defendant renews his earlier arguments and further claims that the trial court's finding at the *Batson* hearing was incorrect.

## TRIAL

Defendant's convictions stem from events occurring in the early morning hours of February 10, 1983. The State's chief witness to these events was Theresa Woods, a waitress at the tavern owned by Jesse James, Sr. According to her testimony, she and James began closing the tavern at 2 a.m. After closing, she checked out the cash registers, leaving $30 in each. Sometime between 3:30 and 4 a.m., Woods and James finished and left the tavern, stopping to lock the door and set the alarm. As Woods and James were leaving, a man whom Woods had never seen before approached them and asked what time the buses stopped running. Woods replied that she did not know and continued to walk away with James.

James and Woods walked across 69th Street to James' car. James stopped to put jumper cables into the trunk. Suddenly, the man who had approached the pair and asked for the time came towards them again, this time grabbing Woods by her coat and pointing a gun at her head. Woods' legs slipped out from under her, and as the man pulled her back up she saw his face.

The assailant ordered Woods and James to get into James' car. Woods went into the rear seat, and following the assailant's command, sat behind James, who was sitting in the driver's seat. Woods testified that from her position in the back seat, and with the aid of streetlights in the area, she was again able to view the assailant's face. Her assailant remained in this position during the time the three spent driving around the streets in the area.

The assailant ordered James to drive to the next corner. When they arrived at the corner, the assailant then ordered James to turn into an alley, drive to the end of it, and stop the car. James complied. The assailant

threatened to kill James and Woods if they did not give him $300. He also told them that he did not "care about" killing the two of them because if he was caught he would be "up for good." James replied that he had some money at his tavern. The assailant then told James to drive back to the tavern. James did so, stopping the car in an alley perpendicular to 68th Street, just behind the tavern.

The assailant then ordered Woods to go into the tavern and retrieve the money. He told her that if she did not return in three minutes, with the money, he would kill James. Woods then ran to the tavern, opened the door, and jumped over the counter to the cash register. She took all the paper money from both cash registers and, without stopping to count it, ran back outside.

When she returned, she noticed that the car had been moved from its original position and was now at the intersection of the alley and 69th Street. When she reached the car, the assailant ordered her to get in. James protested, saying that there was no need for Woods to reenter the car. The assailant then told James to "shut up," and that he, the assailant, was "running this." Woods testified that she then saw the assailant pull James toward himself, and shoot James in the head.

Woods turned and ran, tripping and falling a short distance from the car. She landed on her left side and turned over on her back. The assailant came towards her, stood over her, and pointed his gun at her face. He said: "You bitch." She began pleading: "[P]lease do not do this to me," and raised her hands in the air to protect her face. She rolled to her left as the assailant fired. She then remained lying face down, not realizing at that point that a bullet had entered her right shoulder.

She continued to remain in this position for several minutes, pretending to be dead. After a few seconds she heard the footsteps of a person running away, first on

the pavement and then through weeds growing in an empty lot on the north side of the street. After several seconds had passed she stood up and saw James lying on the ground. She also noticed that the car had now collided with the glass window of a building adjacent to the alley. She then ran back into the bar and called the police.

Chicago police officer Abraham Wilson testified that he arrived at the scene a few minutes after 4:18 a.m. He met Theresa Woods, who said that she and a man had been shot. Officer Wilson then saw James lying on the ground and went over to him. Officer Wilson testified that James told Wilson that an assailant had reached over and shot James and that "he didn't have to do that." Officer Wilson then called for an ambulance, which took Woods and James to a hospital. James later died of a bullet wound to the head.

In order to impeach Theresa Woods' testimony, the defense called Chicago police officer Rene Daniels, Officer Wilson's partner, and Chicago police detective Geraldine Perry. Officer Daniels testified that Woods provided Daniels with a description of the assailant from which Daniels inferred that the assailant was 5 feet 6 inches tall, a height several inches shorter than that of the defendant. Detective Perry, who interviewed Theresa Woods in Billings Hospital, testified that Woods told Perry that Woods had seen the defendant and James struggling in the car as she emerged from the tavern with the money, that the car was moving, and that she saw it collide with the building on the north side of 69th Street. Woods did not tell Perry that she had approached the driver's side of the car, or that she heard any words spoken between James and the offender. Defense counsel also cross-examined Theresa Woods about statements she had given at the hospital to a Dr. Marion Chung, but

the defense did not call Dr. Chung to testify to these statements.

Cleveland Johnson testified that, as he was driving to work, he stopped at the intersection of 63rd and State Streets at approximately 4:15 a.m. While at the intersection, he noticed a man running out from under the State Street underpass. This man, whom Johnson identified as defendant, stopped at the corner of 63rd and State Streets and ducked behind a traffic control box. Johnson then noticed that a police patrol wagon was turning from State Street onto 63rd Street. After the police patrol wagon had passed by, defendant stepped out from behind the box and crossed the street. Meanwhile Johnson, continuing to watch defendant, had slowly turned his car off 63rd Street and onto State Street. Defendant began running behind and alongside the passenger side of Johnson's still moving car. When defendant began hitting the side of the car with his left hand, Johnson stopped the car, reached over to the passenger side and rolled the window several inches down. Defendant then offered Johnson $5 for a ride to 51st Street. As Johnson was considering this offer, defendant reached down with his right hand and tugged at the waistband of his pants.

Officers Michael Grady and Ted Kurzweil of the Conrail police testified that at 4:20 a.m. they were sitting in the front seat of a Chevy Blazer parked on 63rd Street, one block east of State Street. Two Chicago police officers came by and gave the two Conrail officers the description of the man they were looking for in connection with the shootings of Woods and James: "a male black, wearing a blue jean jacket with a large 'fro." The Conrail officers then drove to the corner of State and 63rd Streets, where they saw a man fitting that description, and whom they identified in court as defendant. This man was running alongside a slowly moving car. Officer Grady testified that defendant was holding a gun in his

right hand. The two officers turned down State Street, sped up to catch Johnson's car, and pulled up in front of it. They left their own car and pointed their guns at defendant just as Johnson was considering defendant's offer of five dollars for a ride. Officer Grady ordered defendant to "freeze" and drop his gun. According to Grady, defendant placed the gun in his waistband and said that he "gave up." Officer Grady then pushed defendant over the hood of Johnson's car, patted defendant down, and took a .32 caliber revolver from his waistband.

At trial the prosecution's expert on ballistics testified that, in his opinion, this revolver possessed characteristics identical to those of the weapon which fired the bullet recovered from James' head. He also testified that he had examined the revolver on February 12, 1983, two days after the incident, and that, in his opinion, it had been fired three times shortly before that date.

Shortly after the shooting, Chicago police officers visited Woods in her hospital bed and showed her 10 photographs of faces, including one of the defendant. From this array, Woods selected defendant's photo, and identified him as her assailant. She also identified defendant in court.

At trial, defendant admitted to being the man arrested by the Conrail officers, but denied that he was Woods' assailant. Defendant stated that, on February 9, 1983, he lived alone at 1809 East 71st Street, in an apartment next door to his mother's apartment. At approximately 10 p.m. that evening, defendant went to meet Marie Brown, one of his sisters, at the Toast of the Town Lounge at 71st Street and Stony Island Avenue. He stayed with this sister at the lounge until 3 a.m., when he walked her the half block to her home. Defendant accompanied her into her apartment and helped her move some furniture. He left her apartment some time

later and went to the house of a second sister at 70th Street and Harper Avenue. There he called his wife, and after a while walked to the corner of 71st Street and Stony Island to wait for a bus.

After a few minutes he realized that the 71st Street bus did not run that late, so he began walking north towards 63rd Street, where he knew he could catch a bus. After catching a bus there, he left the bus at the corner of 63rd and State Streets, walked a short distance and stood in front of a corner tavern, waiting for the northbound State Street bus. As he was waiting, he noticed a car traveling slowly north along State Street in front of the tavern. Defendant walked over to the car, knocked on the window, and asked the driver for a ride to 53rd Street. The driver rolled down his window. Defendant offered to pay the driver $5 for the ride. As he was making this offer, a "jeep or truck" pulled up and two men with guns jumped out. When they pointed their guns at defendant, defendant raised his hands in the air.

According to defendant's testimony, when arrested he had no gun in his possession. One of the two officers told him to lean over the hood of the car, and he was then handcuffed and searched. Defendant testified that the officer did not take any object from defendant's possession.

Defendant's sister, Marie Brown, testified that she was with defendant at the Toast of the Town Lounge from 11 p.m. on the night of February 9, 1983. According to Brown, the two of them left the lounge not at 3 a.m. but at 2:15. They then went to Brown's house, where defendant helped her move some furniture. Defendant then left her house at 2:45 a.m.

At the conclusion of the trial, the jury found defendant guilty of murder, attempted murder, aggravated battery, and attempted robbery.

## DEATH SENTENCING HEARING

After the jury returned its verdicts, the State moved to hold a death sentencing hearing. Defendant waived his right to a jury at this hearing. At the first stage of the hearing, the death qualification stage, all of the evidence presented at trial was admitted by stipulation. In addition, the defense called Dr. Marion Chung, a physician who had interviewed and treated Theresa Woods shortly after the shooting. The State argued that defendant was eligible for the death penalty because he was over 18 years of age at the time of the offense; the killing took place in the course of another felony, attempted armed robbery; and Jesse James was actually killed by defendant.

Dr. Chung testified to a statement made by Theresa Woods. The defense argued that this statement impeached Woods' testimony at trial and established that the killing had not taken place during the course of a robbery. According to Dr. Chung, Theresa Woods stated that "a gentleman had come into her working place and had shot the owner and when she saw that happen she turned and tried to flee. She fell, the bullet hit her right shoulder in the back. She fell to the ground and she hit her chin. After she felt the bullet in the right shoulder she fell to the ground."

The trial court found that defendant was eligible for the death penalty (Ill. Rev. Stat. 1981, ch. 38, par. 9—1(b)(6)).

During the second phase of the death penalty hearing, the aggravation-mitigation phase, the State introduced evidence of defendant's eight prior convictions: four for theft, two for armed robbery, and one each for burglary and robbery. Additionally, the State presented evidence that, on April 15, 1969, defendant killed a person named Gary Green. Although the State had initially

charged the defendant with that killing, it moved to nol-pros the charge at a hearing held on January 27, 1972.

Shortly after the State began direct examination of its first witness to this earlier killing, defense counsel stated that he objected to the testimony of the witness and asked to be heard at a sidebar. At the sidebar, defense counsel first stated that he had subpoenaed police reports on the 1969 shooting and had not yet received them. After further discussion, defense counsel stated that he had ordered, but not yet received, the transcript of the January 27, 1972, proceeding at which the charge was nol-prossed. The following colloquy then took place:

"THE COURT: Now, is this—is the point that you are making that you should have transcripts to be able to impeach?

MR. KUNZ: Yes.

THE COURT: That is your total point?

MR. KUNZ: Well my first point is that the state should not be allowed to prove up in aggravation now a case which on their motion was nolled in 1971 or '72.

THE COURT: You are satisfied that it was not a finding of not guilty?

MR. KUNZ: Yes.

THE COURT: It was not a finding of guilty?

MR. KUNZ: I am satisfied with that.

THE COURT: All right. Insofar as—do you have any law to the effect that a case nolled cannot be used by the State in aggravation?

MR. KUNZ: No.

THE COURT: Is there anything about the passage of time that you are incorporating to make your point?

MR. KUNZ: Yes. I would like—I have been telephoning—well, for one thing I need some time to bring in my rebuttal witnesses. I would like to bring in the brother or unless the State will stipulate to the transcript when I get it, that that was his testimony.

THE COURT: Well, you will be allowed all the time that is necessary to bring in witnesses. Excuse me.''

After some discussion as to whether the witness who was currently testifying had previously testified at the 1972 *nolle prosequi* hearing, defense counsel said: "I am just suggesting that I might ask to recall this witness to reopen my cross examination in the event that the transcript I ordered weeks ago shows that this witness did testify." The court responded: "All right. Very well. The record will show that." There is no further indication of any ruling on defense counsel's initial objection to the testimony of the State's first witness, or on counsel's argument that the State should not be allowed to introduce in aggravation facts relating to a charge which the State had previously moved to nol-pros.

The State's first witness was Lynn McDonald. At the time of Gary Green's death in 1969, McDonald lived in the same housing project as Green and defendant. McDonald belonged to a gang known as the Disciples, while defendant belonged to a rival gang, the Blackstone Rangers. McDonald had convictions for bribery and theft.

McDonald testified that on April 15, 1969, he was on the fifteenth floor of an apartment building with several other persons, including Gary Green and Gary's brother, Rochester Green. At approximately 8 p.m. they heard gunshots coming from downstairs. They all went downstairs to the front of the building and to a wall which separated the building from a nearby school. Gary Green went over to the east end of the wall and looked over the top. As Gary Green did this, McDonald saw defendant and another person in the schoolyard opposite the wall. He saw a rifle in defendant's hands. After a few gang slogans were yelled out from both sides of the wall, McDonald saw defendant fire the rifle, turn and walk away. After a moment, he saw defendant turn again and

fire a shot towards the place where Gary Green was standing.

Rochester Green, the brother of Gary Green, also testified that he was present when Gary Green was shot. According to Rochester Green, he, Lynn McDonald, and others were all present at the wall between the school and the apartment building at 8 p.m. on April 15, 1969. They heard a shot and all fell to the ground. After a while Gary Green rose and went to the east part of the wall. Lynn McDonald followed him, as did Rochester Green. As they were going, Rochester Green heard a second shot. He then walked up to the top of the wall and saw defendant and another person running away from the wall towards the street.

The State also called Rudolph Nimocks, a Chicago police officer. Nimocks testified that he had investigated the killing of Gary Green in 1969 and had interviewed Lynn McDonald and Rochester Green. Over a hearsay objection, he testified that both McDonald and Green told him that they were standing at the wall, heard a shot, and, after hearing the shot, looked over the wall to see defendant—first standing and holding a gun, and then running away.

Rochester Green had also testified at the 1972 *nolle prosequi* hearing. At that time he stated he had been playing on a ball field at the time of the shooting, that he had seen the person who shot his brother, a person who had the nickname of "Rat," and who was not defendant.

The defense adduced expert testimony that the bullet which killed Gary Green could only have been fired from a handgun, and could not have been fired from a rifle such as the one Lynn McDonald testified he had seen defendant fire at Gary Green.

Defense counsel also attempted to introduce into evidence statements made by the assistant State's Attorney

at the *nolle prosequi* hearing. At that hearing the assistant State's Attorney stated to the court:

> "Your honor, based on this information, and I would first indicate as I told Mrs. Janie Green and also her boy, that on their part, being related to the victim, I am very impressed and the State was very impressed by their candor and by their appearance and their apparent search for the truth during the time this matter had been pending when they found out who, in fact, was the actual murderer, since they called it to our attention this morning, the State would at this time, being interested only in justice, your honor, move to nolle prosse this case."

At the sentencing hearing defense counsel also attempted to introduce evidence that at the *nolle prosequi* hearing, the court sustained the State's motion to nolpros and stated: "The record should indicate that the People of the State of Illinois in this instance, has done what the court feels is right, and they are to be commended for their actions." At the sentencing hearing, the court sustained the State's objection to all of these statements.

Defendant presented the following evidence in mitigation. He testified that, as a youth, he had been intimidated by gang members and forced to pay protection money. Since he seldom had any money he eventually formed for his own protection his own gang, which, he admitted, later became affiliated with the gang known as the Blackstone Rangers. However, he denied killing Gary Green. He was first sent to Cook County jail at the age of 16. During this stay in prison he admitted fighting with other inmates but testified that he fought only in order to protect himself from homosexual rape. During this first stay in prison he was often subject to discipline.

During a second stay in prison he was a model inmate. He taught art classes, was never subject to disci-

pline, was never placed in segregation, and received several commendations. He received one commendation for helping a fellow inmate who had been stabbed several times in the chest in a gang-related incident. Defendant approached the wounded inmate as he lay bleeding in the prison gallery, and persuaded another inmate to help him carry the wounded man to the prison hospital. After receiving the commendation, defendant wrote to prison authorities asking that he receive good-time credit in addition to the commendation.

Defendant also presented evidence of his long-standing talent for, and interest in, art, both by his own testimony, and by the admission of many of his paintings.

Defendant also presented the testimony of his current parole officer. She testified that he had complied with all rules and regulations pertaining to his parole and had fully availed himself of supervision. Finally, defendant presented the testimony of Anna and Fred Warnken, at whose Kansas farm defendant had stayed for three weeks in October 1982. They both testified that they trusted defendant and would invite him to stay with them again.

The trial court, assessing the evidence in the aggravation-mitigation phase, found that defendant had killed Gary Green, and had a long and significant history of criminal activity. In addition, the court found that defendant had intentionally killed Jesse James, Sr., and had exhibited extreme cruelty when he did so. The court found no mitigating factors to be present. While noting that defendant's viciousness may have been originally a tactic motivated by defendant's need to protect himself, it concluded that defendant was now inherently "vicious." The court refused to find that defendant's artistic talent was a mitigating factor; rather it found that talent aggravated his offense because it indicated that he had possessed an alternative to a life of crime. Finally

the court considered whether defendant's aid to the wounded inmate was mitigating, but concluded that defendant's letter asking for good-time credit indicated that defendant's aid had been selfishly motivated. The court found "no mitigating factors within the evidence," and sentenced defendant to death. The court also sentenced defendant to 30 years' imprisonment for attempted murder and 15 years' on each conviction for attempted armed robbery, the attempted murder conviction term to run consecutively to the two attempted armed robbery conviction terms.

## POST-TRIAL HEARING

At a post-trial hearing in which defendant was represented by new counsel, defendant sought to demonstrate that he was entitled to a new trial because of the alleged incompetence of his original attorneys, the State's alleged concealment of a witness, and the State's alleged alteration of the testimony of certain other witnesses.

At this hearing Jamison Kunz and Russell Born, defendant's attorneys at trial, testified on his behalf. Kunz testified that he had received through discovery police reports which stated that defendant's apprehension had "cleared up" 30 previously unsolved armed robberies, as well as several shootings. Kunz testified that he had been told by a police officer that this information was false, and that the police officer would have been available to so testify. Kunz testified that, while defendant asked him to use this evidence as impeachment, Kunz did not do so.

Kunz also testified that Assistant State's Attorney Daniel Franks had informed Kunz during the trial that the State would not call as a witness Dr. Marion Chung, the physician who had treated Theresa Woods. On April 26, 1984, the second day of trial, when Kunz, keeping a "poker face," casually inquired about Dr. Chung's

whereabouts, the State's Attorney told Kunz that Dr. Chung was on vacation and "out of town." Kunz testified that he did not pursue the matter further because he believed that he could adequately impeach Theresa Woods' testimony by calling Officer Daniels and Detective Perry, and that further impeachment would only tend to confuse the jury. Russell Born, an attorney who assisted Kunz during the trial, also testified to the State's Attorney's statement about Dr. Chung's whereabouts.

Kunz further testified that although he was aware that defendant suffers from a missing lower front tooth and resulting slight speech impediment, he did not cross-examine Theresa Woods about whether she noticed the missing tooth or the speech impediment. Finally, Kunz testified that he never cross-examined Theresa Woods about defendant's moustache.

Dr. Marion Chung testified that she had in fact received a subpoena from the State's Attorney's office to testify against defendant. She then told an assistant State's Attorney, Timothy McKay, that she would return from her vacation on Wednesday, April 25, 1984. She in fact returned from her vacation on that day. On the following day, April 26, she went to an office of the State's Attorney. She was taken into a small conference room. Two other witnesses, police officers, were also in the room. After a while, Assistant State's Attorney Daniel Franks entered the conference room and began talking to the police officers. The conversation involved the position of the two officers' car when they saw defendant running across the intersection. Both officers stated that their car was not parked immediately next to the intersection, but instead was parked one car length away. Franks disagreed with the officers, stating that the car was probably closer to the corner—a position from which they would have had a better view of defendant as he

ran across the intersection. The conversation continued for an hour, and the two officers eventually agreed that the car must have been parked closer to the intersection than they had remembered.

Dr. Chung also testified that she had a conversation with Franks. Franks had Chung review the medical records she had written concerning Theresa Woods, which included a record of what Woods had told Chung about the shooting. Franks then asked Chung several times if she was absolutely sure that what she had written was an accurate record of what Woods had told her. Franks conversed with Chung for 15 to 20 minutes, and finally informed Chung that the medical record was "totally the opposite" of Woods' trial testimony.

At the post-trial hearing the court denied defense counsel's motion to dismiss and supplemental motion for a new trial. It found no ineffective assistance of counsel, no attempt by the State to hide a witness, and no attempt to alter witness testimony.

We now consider the issues raised by defendant.

## THE CONVICTIONS
### Prosecutorial Nondisclosure

Defendant first claims that the prosecutor's apparent misrepresentation of Dr. Chung's whereabouts and failure to disclose that she would impeach Theresa Woods violated the prosecution's obligation to disclose relevant exculpatory material to the defense. Even assuming that the prosecution in fact misrepresented Dr. Chung's whereabouts or failed to disclose her impeachment evidence, we do not agree that these acts, under these circumstances, constitute error.

The defendant concedes that neither of his trial attorneys specifically requested that the prosecution produce Dr. Chung as a witness, or otherwise provide any infor-

mation about her. Under *Brady v. Maryland* (1963), 373 U.S. 83, 87, 10 L. Ed. 2d 215, 218, 83 S. Ct. 1194, 1196-97, the prosecution has a duty to disclose exculpatory material to the accused upon specific request. In the absence of a specific request, *Brady* does not apply to this case. However, the United States Supreme Court has also recognized that the prosecution has a duty to provide certain exculpatory material to the defense even absent a specific request. (*United States v. Agurs* (1976), 427 U.S. 97, 111-12, 49 L. Ed. 2d 342, 354, 96 S. Ct. 2392, 2401.) Under *Agurs*, the prosecution's duty to disclose absent request extends only to evidence "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce" (427 U.S. at 107, 49 L. Ed. 2d at 351, 96 S. Ct. at 2399) and which "creates a reasonable doubt that did not otherwise exist" (427 U.S. at 112, 49 L. Ed. 2d at 355, 96 S. Ct. at 2402). Stated in another way, the undisclosed evidence will be considered material only if its "suppression undermines confidence in the outcome of the trial" (*United States v. Bagley* (1985), 473 U.S. at 678, 87 L. Ed. 2d at 491, 105 S. Ct. at 3381), and if there is a "reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different" (473 U.S. at 682, 87 L. Ed. 2d at 494, 105 S. Ct. at 3384). We are unable to agree with the defendant's contention that the appearance of Dr. Chung as a witness for either the prosecution or the defense would have changed the outcome of the trial.

The crucial fact is that Dr. Chung could only have testified to the same statements, contained in the medical records as recorded by Dr. Chung, that were already available to the defense and which the defense in fact used to cross-examine Theresa Woods. The defense may have achieved some marginal benefit from having Dr. Chung testify to the impeaching statement, particularly

since Dr. Chung appeared to agree with the defense position that this statement was actually inconsistent with Theresa Woods' testimony at trial. The defense might also have benefited, as it may have intended, if the prosecution had carried out its original plan to call Dr. Chung as its own witness—presumably for the purpose of describing Theresa Woods' wounds. In that case, the defense might have achieved the minor tactical advantage which would flow from eliciting the impeaching statement from the mouth of the prosecution's own witness. Presumably it was these considerations of tactical advantage which led defense attorney Kunz to casually inquire, keeping a "poker face," as to the whereabouts of Dr. Chung. But these minor tactical advantages cannot compare to the solid evidence of defendant's guilt—particularly his presence near the scene of the crime in possession of the murder weapon, and the positive identification by the surviving victim.

Moreover, it is far from clear that Dr. Chung's testimony would have been truly exculpatory. Theresa Woods' statement to her was extremely brief. Dr. Chung's interest in the statement, as she herself admitted during the hearing, was medical, not legal. She did not care about the details of the crime but only about the location and cause of Theresa Woods' wounds. While a police investigator might have inquired further into exactly who did what, when, where, and how, Dr. Chung was satisfied once she knew that the bullet had struck Theresa Woods in her right back shoulder. Moreover, the statement itself, as recorded by Dr. Chung, is susceptible of an interpretation consistent with Woods' trial testimony. The statement does not directly assert that Jesse James was shot in the tavern but that "a gentleman had come into her working place *and* shot the owner." (Emphasis added.) While the defense might have nevertheless made some capital out of the remaining inconsistencies be-

tween the statement and the trial testimony, these inconsistencies are not so severe as to undermine confidence in the outcome of the trial.

The same reasoning applies, *a fortiori*, to the possibility that Dr. Chung could have testified to the prosecutor's coaching of the two Conrail officers. We should say at the outset that had Dr. Chung witnessed an attempt to suborn perjury we might resolve this issue differently. But she did not. The prosecutor did not tell the two police officers to say that they had seen the defendant with a gun. They were already convinced that they had seen the defendant with a gun. However, they also apparently believed that they were slightly farther from the curb than the prosecutor thought was consistent with their view of the gun. Thus the prosecutor sought to convince them that they must have been parked in a position consistent with their observation. Such an effort is permissible, and the impeaching effect of this testimony would have been diminished by the instruction to the jury that an attorney has the right to interview witnesses (Illinois Pattern Jury Instructions (IPI), Criminal, No. 3.10 (2d ed. 1981)). It would also not have gone so far as to enable defendant to refute the Conrail officers' testimony that they had found him in possession of the gun. At best it would have raised a minor doubt as to their ability to recall the precise details of events which had occurred over a year before. Again, we cannot conclude that the disclosure of this evidence would have created a reasonable probability of a different outcome.

Moreover, were we to hold otherwise, the prosecution would be saddled with an impossible burden. It would be forced to give the defense a running commentary upon all of its interviews with its own witnesses. Any prosecutor confronted with such a rule would be forced to "allow complete discovery of his files as a matter of routine practice." (*United States v. Agurs* (1976), 427 U.S. 97,

109, 49 L. Ed. 2d 342, 353, 96 S. Ct. 2392, 2400.) Such a rule would, in fact, give the defense discovery of much greater scope than is enjoyed by the typical civil litigant, whose ability to discover the other side's case is limited by the attorney-client privilege and by the work-product rule. Whatever the intrinsic merits of providing criminal defendants with such massive disclosure, we decline to hold that it is constitutionally required.

## Ineffective Assistance of Counsel

Defendant also argues that his attorneys' failure to subpoena Dr. Chung or to use the medical record to impeach Theresa Woods denied him his sixth amendment right to effective assistance of counsel. It should also be noted that, at the post-trial hearing, although not in his brief here, defendant claimed ineffective assistance of counsel based upon a number of other grounds, such as defense counsel's alleged failure to use available information to impeach some of the State's witnesses. All of these claims are without merit.

In *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052, the United States Supreme Court clarified the standards governing ineffective assistance of counsel claims. To prove ineffective assistance the defendant must first demonstrate that his counsel's performance failed to meet reasonable professional standards. Second, the defendant must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different. (*Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064.) In this case we are unable to conclude that counsel's performance failed to meet reasonable professional standards. Even were we to so conclude, we find that any defects in counsel's performance were not so severe as to demonstrate a rea-

sonable probability of a different result absent the defects.

First, we do not find that counsel's decision not to call Dr. Chung was a failure to meet reasonable professional standards. The United States Supreme Court has made clear that the proper standard for attorney performance is that of "reasonably effective assistance" (*Strickland v. Washington* (1984), 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064), which is " 'within the range of competence demanded of attorneys in criminal cases' " (466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064, quoting *McMann v. Richardson* (1970), 397 U.S. 759, 771, 25 L. Ed. 2d 763, 773, 90 S. Ct. 1441, 1449). Given the variety of circumstances faced by defense counsel and the range of legitimate decisions regarding how best to represent a defendant, "[j]udicial scrutiny of counsel's performance must be highly deferential." (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) In fact, the defendant claiming ineffective assistance must overcome a strong presumption that the challenged action of counsel was the product of sound trial strategy and not of incompetence. (466 U.S. at 689, 80 L. Ed. 2d at 694-95, 104 S. Ct. at 2065.) The defendant has failed to overcome this presumption.

Defense counsel's decision not to call Dr. Chung is a good example of the kind of on-the-spot, seat-of-the-pants attorney judgment which deserves judicial deference. Defense counsel's decision as to whether to call Dr. Chung had to be made relatively quickly, and under fairly trying circumstances. While the medical reports containing Dr. Chung's statement were available to counsel before trial, counsel was not aware until the prosecutor's opening statement of the content of Theresa Woods' testimony. Thus counsel had no way of ascertaining the value of the medical report up until that

point. Once aware of the possible discrepancy between the testimony and the statement in the medical report, counsel prepared for eventual impeachment by cross-examining Woods about the discrepancy, as well as about other allegedly inconsistent statements she had made to Officer Daniels and Detective Perry. Presumably, at that point counsel was still acting on the assumption that the prosecution would call Dr. Chung as its own witness, and that he could complete the impeachment of Woods by cross-examining Chung.

Only on the day after Woods testified did defense counsel learn that the prosecution did not intend to call Dr. Chung. At that point, defense counsel was forced to decide whether to subpoena Dr. Chung as a defense witness, and perhaps whether to seek a continuance if necessary. As counsel testified, he was aware that the decision turned upon the value of Dr. Chung's testimony. While he believed that Dr. Chung's testimony might be valuable, he also believed that Woods' testimony could also be substantially impeached by the testimony of the two police officers. As he testified at the hearing, he felt that further impeachment might only have confused the jury. Apparently the prosecutor's statement that Dr. Chung was out of town, thus necessitating a continuance, tipped the balance against calling Dr. Chung as a witness.

Given the marginal value of Dr. Chung's testimony, we are unable to say that this decision violated reasonable professional standards. Counsel was unaware of Dr. Chung's own belief as to the meaning of Woods' statement. He believed that the other inconsistent statements given by Woods to the two police officers adequately established impeachment. And while further investigation of the matter, such as a call to Dr. Chung herself, might have changed his assessment, we cannot conclude that his decision not to investigate further was in itself an

unreasonable professional judgment. Counsel only has a duty to make reasonable investigations or to make a reasonable decision which makes particular investigations unnecessary; and the reasonableness of a decision not to investigate is assessed applying a heavy measure of deference to counsel's judgment. (*Strickland v. Washington* (1984), 466 U.S. 668, 689, 80 L. Ed. 2d 674, 694, 104 S. Ct. 2052, 2065.) Giving such deference, we find that counsel's decisions regarding Dr. Chung were not unreasonable.

Even assuming that counsel's decision regarding Dr. Chung was unprofessional, we cannot agree with defendant that there is a reasonable probability of a different outcome had counsel made a different, and a better, decision. We have already described above, in discussing the prosecutor's failure to disclose Dr. Chung's whereabouts, why we believe that Dr. Chung's testimony would not have had any appreciable effect on the jury. For the same reasons we conclude that defense counsel's decision not to call Dr. Chung did not deprive defendant of a fair trial.

Finally, as to the other claims of ineffective assistance which defendant raised at the hearing but which he failed to renew in his brief here, we find that defendant has also failed to demonstrate either a departure from professional standards or a reasonable probability that different decisions would have changed the outcome of the trial. As the trial court noted below, the extent to which an attorney should attempt to impeach a witness is often a matter of very fine tactical judgment, which should be given great deference by a reviewing court. We cannot say, on this record, that defense counsel's decision not to impeach the police witnesses by use of the false claim in the police report was unprofessional. Defense counsel may well have believed that the jury would have believed that defendant's arrest really had "cleared

up" 30 prior crimes. Similarly, defense counsel's decision not to cross-examine Theresa Woods about defendant's missing tooth, speech impediment, and moustache may have been motivated by fear that Theresa Woods might state that she did not remember these details, or by the belief that the details were too minor to cast a significant doubt upon her credibility. In any event, it cannot be said, to a reasonable probability, that the use of this impeachment evidence would have changed the outcome of the trial.

### Prosecutorial Comments in Summation

Defendant also claims that several different comments made by the prosecutors in closing arguments were so prejudicial as to deprive defendant of a fair trial.

In the first set of challenged remarks, the prosecutors argued that the jurors enjoyed "a unique opportunity *** to do something about crime." Whereas in daily life "We listen to it on the news, in the newspaper ***. Everybody hears about crime. Nobody does anything about it. You have a unique opportunity to actually do something about crime on your streets." Embellishing upon this theme, the prosecutor concluded, "You are the only ones that sit between this man, this ticking bomb, and that door."

The remarks in this series were apparently intended to persuade the jurors to convict because by convicting they would prevent both crime in general, and further crime by this defendant. As such, they were proper. It is entirely proper for the prosecutor to dwell upon the evil results of crime and to urge the fearless administration of the law. (*E.g., People v. Owens* (1984), 102 Ill. 2d 88, 105-06; *People v. Jackson* (1981), 84 Ill. 2d 350, 360; *People v. Wright* (1963), 27 Ill. 2d 497, 500-01.) Moreover, this court has previously held nonprejudicial re-

marks which were nearly identical to the remarks complained of here, and equally harsh. For example, in *People v. Benedik* (1974), 56 Ill. 2d 306, 310-11, the prosecutor stated that he only wanted to " 'leave you with this, if this is a crime of violence, if a week from today or a month from today you may be seated at your breakfast table and you may be reading the newspapers and you may be saying to yourself, what, shaking your head in the negative, why isn't something being done about the violence in society today?' " In *People v. Owens* (1984), 102 Ill. 2d 88, 105, the prosecutor stated that " '[i]t's a sad commentary on modern America that people all too often become prisoners in their homes at night. They are afraid to walk the streets because they fear that exactly what happened to George Kallai would happen to them.' " (102 Ill. 2d at 105.) Finally, in *People v. Wright* (1963), 27 Ill. 2d 497, 500, the prosecutor rhetorically asked the jury if they were going to let murderers walk the streets so they could kill someone else. Under these precedents, the prosecutorial comments in this case cannot be considered so prejudicial as to deprive defendant of a fair trial.

A second remark that defendant claims was so prejudicial as to deprive him of a fair trial was the prosecutor's admonition to the jury: "Don't be confused as the defense wishes you to be." An objection to this comment was sustained. Defendant argues, correctly, that it is error for a prosecutor to accuse defense counsel of attempting to create confusion (see *People v. Weathers* (1975), 62 Ill. 2d 114, 120), or of fabricating a defense (see *People v. Emerson* (1983), 97 Ill. 2d 487, 498-99). However, the trial court's act of sustaining an objection to such a comment, taken together with the trial court's general admonition to the jury that it should disregard any comments to which the court has sustained an objection, may serve to alleviate any prejudice caused by a

particular objectionable comment. (See *People v. Clark* (1972), 52 Ill. 2d 374, 390.) This is particularly true where, as here, the comment objected to was relatively innocuous. In both *Weathers* and *Emerson*, the two cases cited by the defendant, the challenged remarks were far more prejudicial. In *Weathers*, the prosecutor accused the defense attorneys of lying and of attempting to create a reasonable doubt by " 'confusion, indecision, and misrepresentation.' " (*Weathers*, 62 Ill. 2d at 120.) In *Emerson*, the prosecutor speculated that the defense attorneys knew that they had to "make something up," and that they therefore concocted a spurious attack on the credibility of the chief witness for the prosecution. (*Emerson*, 97 Ill. 2d at 498.) In contrast, the comment here challenged did not go so far as to accuse defense counsel of deliberately misleading the jury. Under these circumstances the sustained objection and curative instruction served to dissipate any prejudice this statement may have caused.

Defendant also argues that he was prejudiced by the prosecutor's statement that the standard of reasonable doubt is the "same standard that's been used in this court room, in all the court rooms in this country, throughout the county, throughout the State, throughout the country, through our entire history. It's nothing new. There is nothing different about that standard of proof. That standard of proof does not require perfection." The quoted statement about the standard of reasonable doubt is nearly identical to the statements held proper in *People v. Collins* (1985), 106 Ill. 2d 237, 277. Since defendant has not attempted to distinguish *Collins* or to argue that it should be overruled, we perceive no merit in defendant's argument.

Finally, defendant argues that he was prejudiced by the prosecutor's comment that paraffin tests were no longer considered a reliable means of determining

whether a person had fired a gun. The prosecutor's comments were in response to defendant's argument that the police should have administered a paraffin test to defendant, and were fairly based upon the testimony of an expert witness who stated that paraffin tests are no longer considered reliable because they can yield both falsely positive and falsely negative results. Therefore, defendant's argument lacks merit.

## THE SENTENCE

Defendant's attack on his death sentence may be divided into two parts. In the first part defendant makes a number of claims of error relating to the court's consideration of evidence that defendant killed Gary Green in 1969. In the second part, defendant launches a facial attack against the validity of the Illinois death penalty statute, alleging several different constitutional defects. We consider each part of defendant's arguments in turn.

### The 1969 Killing

As to the 1969 killing, defendant first claims that the State should have been barred from introducing evidence about the 1969 killing on the grounds of delay in prosecution, double jeopardy, *res judicata*, and collateral estoppel. In response, the prosecution claims that these arguments have been waived by defendant's failure to include them in any of his post-trial motions. Because we believe that defendant's sentence must be vacated on other grounds, we need not consider any of these arguments, or whether they have been waived.

Defendant next claims that evidence of the 1969 killing should have been excluded because it was neither relevant nor reliable, in contravention of our statute and case law (see Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e); *People v. Perez* (1985), 108 Ill. 2d 70, 86). The State has not argued that this claim has been waived. Because we

agree that the 1969 killing should have been excluded, we now vacate defendant's murder sentence.

Defendant first argues, and we agree, that the trial court erred by considering the 1969 killing a "murder," particularly in view of the fact that defendant has never been convicted of that crime, and has certainly never been proved guilty beyond a reasonable doubt. Thus, the trial court erred, at a minimum, in attributing to the 1969 killing far greater weight than it could possibly deserve. And while we normally presume that a sentencing judge only considers admissible evidence, we cannot say that the court here excluded the 1969 killing from consideration, given its own heavy emphasis upon the killing during its summary of the evidence.

Moreover, defendant argues, and we agree, that the trial court erred by excluding evidence of the prosecution's reasons for moving to nol-pros the prior murder charge against defendant. Given the broad range of evidence traditionally considered probative in sentencing, it was surely error to conclude that the 1972 prosecutor's reasons for believing that defendant did not kill Gary Green in 1969 were irrelevant. The prosecutor stated, on the record, that the victim's mother and brother had independently investigated the crime and had discovered that defendant was not the killer. The prosecutor's statements were buttressed by the 1972 testimony of the victim's brother. Moreover, the judge at the *nolle prosequi* hearing went out of his way to commend the prosecutor's decision to nol-pros the case. Given these facts, the trial court's decision to consider the 1969 killing "the murder of Mr. Green," stating that "the evidence is positive and credible that the defendant did kill Mr. Green in 1969," and at the same time to refuse to consider why the previous case against this defendant had been dropped, was in error.

We therefore hold that the evidence of the 1969 killing should have been excluded as irrelevant, both because of the 1972 decision to nol-pros the case based on evidence that defendant had not committed the crime, and because the trial court's reliance upon the 1969 killing as an aggravating factor was misplaced. We further find that the evidence concerning the 1969 killing was unreliable.

The evidence admitted at a death penalty hearing must be both reliable and relevant. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(e); *People v. Perez* (1985), 108 Ill. 2d 70, 86.) In this case the evidence admitted was not reliable. This aggravating factor was a 15-year-old killing. As the trial court admitted in its summary of the evidence, the testimony of one of the prosecution witnesses, Rochester Green, was severely impeached by his prior inconsistent testimony at the 1972 hearing. While he attempted to explain the inconsistency by stating that he had simply "heard" in 1972 that a person named "Rat" had killed his brother, this explanation contradicts his testimony at the sentencing hearing that he was present when his brother was killed. As for the testimony of Lynn McDonald, it is impeached both by his statement that defendant shot Gary Green with a rifle, a statement flatly contradicted by the ballistics evidence, and by his membership in a rival gang. Therefore, the evidence concerning the 1969 killing was unreliable and should not have been considered by the trial judge.

While we normally indulge a presumption that a sentencing court only considers relevant and admissible evidence, that presumption is rebutted in this case by the court's own summary of the evidence. That summary, and particularly the court's characterization of the 1969 killing as a "murder," makes clear that the court gave the evidence of that killing great weight in its decision. To do so was error and necessitates vacation of defend-

ant's death sentence and remand for a new sentencing hearing at which evidence of the 1969 killing will not be admitted. We turn now to defendant's arguments for the unconstitutionality of the death penalty act.

## Constitutional Challenges to the Death Penalty Act

The second part of defendant's attack on his sentence consists of various arguments that the Illinois death penalty statute is unconstitutional. Defendant first argues that the statute is unconstitutional because the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1983, ch. 38, pars. 104—22, 104—26) improperly exempts from subjection to the death penalty those who need special assistance to stand trial. In our initial opinion in this case, we held that defendant waived this claim by failing to raise it in any of his post-trial motions. Defendant subsequently filed a petition for rehearing in which he cites *People v. Bryant* (1989), 128 Ill. 2d 448, as authority for the proposition that his claim should not have been deemed waived. We need not address the question raised in defendant's petition for rehearing, however, because even if we assume without deciding that defendant's claim has not been waived, defendant would not prevail on the merits of his claim. This court has previously rejected the argument that the statute is unconstitutional in exempting persons in need of special assistance from the death penalty (see *People v. Ashford* (1988), 121 Ill. 2d 55, 90; *People v. Perez* (1985), 108 Ill. 2d 70, 94-95), and we decline to reconsider these prior decisions.

Defendant next argues that this court should reconsider its holdings in those cases in which it has upheld the constitutionality of the Illinois death penalty statute against claims that the statute violates the eighth-amendment prohibition against cruel and unusual punishment because it does not contain adequate safeguards to prevent arbitrary and capricious imposition of death sen-

tences. Defendant acknowledges that this court has rejected claims of unconstitutionality based upon: overly broad prosecutorial discretion (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531), inadequate comparative proportionality review (*People v. Brownell* (1980), 79 Ill. 2d 508), absence of written findings by the sentencer (*People v. Gaines* (1981), 88 Ill. 2d 342), inadequate pretrial notice of aggravating factors (*People v. Davies* (1983), 95 Ill. 2d 1), absence of a requirement to find that death is the appropriate sentence (*People v. Free* (1983), 94 Ill. 2d 378), and language in the statute allegedly allowing the sentencer to place the burden of proof upon the defendant (*People v. Del Vecchio* (1985), 105 Ill. 2d 414). The defendant's sole ground for reconsideration appears to be that a single justice of the United States Supreme Court, with whom a second justice concurs, has dissented from denials of *certiorari* in a number of our cases, and has stated in these dissents that the Illinois statute is unconstitutional. (See *Albanese v. Illinois* (1985), 471 U.S. 1044, 1045, 85 L. Ed. 2d 335, 335-36, 105 S. Ct. 2061, 2062 (Marshall, J., dissenting from denial of *certiorari*); *Gacy v. Illinois* (1985), 470 U.S. 1037, 1038, 84 L. Ed. 2d 799, 799, 105 S. Ct. 1410, 1410-11 (Marshall, J., dissenting from denial of *certiorari*); *Eddmonds v. Illinois* (1984), 469 U.S. 894, 895-98, 83 L. Ed. 2d 207, 207-10, 105 S. Ct. 271, 271-74 (Marshall, J., dissenting from denial of *certiorari*); *Jones v. Illinois* (1983), 464 U.S. 920, 920-21, 78 L. Ed. 2d 264, 264-65, 104 S. Ct. 287, 288 (Marshall, J., dissenting from denial of *certiorari*).) While opinions joined in by two Supreme Court justices may have some persuasive value, they are not, without more, adequate ground for reconsideration of binding precedent. Therefore, we decline to reconsider our prior holdings.

The final ground upon which defendant urges us to hold the death penalty statute unconstitutional is that

the statutory aggravating factors used to qualify persons convicted of murder for the death penalty under the Illinois death penalty act (Ill. Rev. Stat. 1981, ch. 38, pars. 9—1(a), (b)) are the same aggravating factors, with one exception, as those used to qualify persons convicted of murder for sentences of life imprisonment under the Illinois Unified Code of Corrections (Ill. Rev. Stat. 1981, ch. 38, par. 1005—8—1(a)(1)). Therefore, defendant argues, the statutory aggravating factors do not adequately circumscribe the class of persons eligible for the death penalty and thus do not prevent death sentences from being imposed in an unconstitutionally arbitrary and capricious manner. However, while defendant's appeal was pending, this court rejected this same argument in *People v. Shum* (1987), 117 Ill. 2d 317, 373-74, *People v. Lego* (1987), 116 Ill. 2d 323, 352-53, and *People v. Whitehead* (1987), 116 Ill. 2d 425, 463-65. For the reasons stated in those cases, we similarly reject defendant's argument here.

We are aware of the opinion of the United States District Court for the Central District of Illinois, filed April 29, 1989, in the case of the *United States ex rel. Silagy v. Peters*, No. 88—2390. In that case the court held the Illinois death penalty statute (Ill. Rev. Stat. 1979, ch. 38, par. 9—1) unconstitutional. In passing on Federal constitutional questions, State courts and lower Federal courts have the same responsibility and occupy the same position. Until the Supreme Court of the United States has spoken, State courts are not precluded from exercising their own judgments on Federal constitutional questions. Because lower Federal courts exercise no appellate jurisdiction over State courts, decisions of lower Federal courts are not conclusive on State courts, except insofar as the decision of the lower Federal court may become the law of the case. *United States ex rel. Lawrence v. Woods* (7th Cir. 1979), 432 F.2d 1072; see also *City of*

*Chicago v. Groffman* (1977), 68 Ill. 2d 112; *People v. Stransberry* (1971), 47 Ill. 2d 541.

## THE *BATSON* HEARING

Having disposed of the matters originally raised by the defendant prior to our remand of the case to the trial court, we turn now to defendant's contentions regarding the State's use of peremptory challenges on black venirepersons. Defendant argues that the trial court's finding at the *Batson* hearing should be reversed because the trial court erred in (1) not requiring the prosecutor at the original trial to testify at the *Batson* hearing under oath and subject to cross-examination, and (2) finding that the State's explanations rebutted defendant's *prima facie* case.

The jury in this case was selected in three different panels of four jurors each. The first panel was sworn when it was selected on April 23, 1984. The second and third panels were each separately chosen and sworn on April 24, 1984. On April 25, 1984, the jury was sworn as a whole and the trial began. Before the jury had been sworn as a whole, but after each of the three panels had been separately chosen and sworn, defendant moved that a mistrial be declared on the grounds that the State exercised its peremptory challenges to systematically exclude blacks from the jury. The State's only reply to the motion was the prosecutor's statement that the State would:

"stand on the record *** that there was [*sic*] a number of things on a number of [the black venirepersons excluded by the State] that made them unacceptable. The State made no concerted attempt to exclude any race or nationality during the course of *voir dire*."

The trial court then denied defendant's motion.

After the trial, defendant appealed directly to this court, arguing *inter alia* that his convictions should be

reversed because the State had used its peremptory challenges to systematically exclude blacks from serving on the jury. In light of the Supreme Court's decisions in *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712, and *Griffith v. Kentucky* (1987), 479 U.S. 314, 93 L. Ed. 2d 649, 107 S. Ct. 708, this court issued a supervisory order remanding the case to the trial court for a hearing on defendant's claim that the State unconstitutionally exercised its peremptory challenges on black venirepersons. The order directed the trial court to allow defendant to present evidence in support of his claim. The order further stated that if the trial court found that defendant established a *prima facie* case of discrimination, the trial court should allow the State to present evidence that the black venirepersons were excluded for nonracial reasons. The order finally instructed that at the conclusion of the hearing, the trial court "shall make appropriate findings of fact and conclusions of law and file those findings and conclusions with the clerk of this court within 63 days of this order, together with the record of the proceedings."

At the hearing it was established that 2 of the 12 jurors were black. It was also undisputed that the State had exercised 15 of its 20 peremptory challenges on blacks. The record was not clear as to the race of two other members of the venire who had been peremptorily challenged by the State, but the trial court concluded that they were black. Based upon its finding that the State exercised 17 out of its 20 peremptory challenges on blacks, the trial court concluded that defendant established a *prima facie* case of discrimination.

In rebuttal, the State offered the testimony of one of the prosecutors in the case, who testified that the State exercised each of its peremptory challenges for race-neutral reasons. The prosecutor explained that he generally looked for jurors who had strong ties to their commu-

nity. In particular, he sought jurors who were homeowners and had been employed at the same job for a number of years. He also looked for jurors who had families and whose families had roots in the community. He then explained his specific reasons for excluding each of the 17 black venirepersons. After hearing argument from both the State and defendant, the trial court orally stated its findings of fact regarding the State's explanations for excluding 16 of the 17 venirepersons. The court failed to make a specific finding in regard to the seventeenth venireperson. The court concluded by stating that it found that the State's peremptory challenges were based upon neutral reasons, thereby rebutting defendant's *prima facie* case. The transcript of the hearing was subsequently filed with the clerk of this court.

Defendant argues that the trial court should have required the prosecutor to testify at the *Batson* hearing under oath and subject to cross-examination. Defendant further claims that the trial court should not have found that the State's explanations rebutted defendant's *prima facie* case of discrimination. The State, on the other hand, asserts that defendant waived his *Batson* argument by failing to raise it until after the jury had been sworn; failing to preserve a record of the black venirepersons stricken by the State; and failing to raise the *Batson* issue in his motions for a new trial. The State also argues that even if defendant did not waive the issue, the trial court's determinations in the *Batson* hearing should be upheld. We first address the State's waiver arguments.

The State argues that defendant's failure to object to the State's peremptory challenges until after the last panel was sworn constituted a waiver. The State's argument is based upon the well-established rule that challenges to the composition of a jury must be brought before the jury is sworn. (See *People v. Evans* (1988), 125

Ill. 2d 50, 61-62; *People v. Gaines* (1981), 88 Ill. 2d 342, 359.) However, it is equally true that the principle of waiver applies to the State as well as to the defendant. *People v. O'Neal* (1984), 104 Ill. 2d 399, 407.

In this case, the State did not raise the issue of the timeliness of defendant's objection to the State's use of peremptory challenges when defendant initially filed its pretrial motion for a mistrial, but instead challenged the motion solely on its factual merits. The State also failed to raise the issue in either its initial briefs with this court or at the *Batson* hearing conducted by the trial court on remand. It was not until its supplemental brief, filed with this court after the *Batson* hearing had been conducted, that the State first raised the issue. We therefore conclude that the State has waived its argument that defendant's objection to the State's exercise of peremptory challenges was untimely. (See *State v. Lee* (Tex. App. 1988), 747 S.W.2d 57, 58 (State waived its objection on appeal to untimeliness of defendant's *Batson* motion by failing to so object at trial); see also *People v. Colley* (1988), 173 Ill. App. 3d 798, 806 (State is estopped from arguing untimeliness of defendant's *Batson* motion where it failed to raise issue at trial).) We also find that the State has waived its argument pertaining to defendant's failure to include the issue of the jury's composition in its post-trial motion for a new trial since the State similarly failed to raise this argument until its supplemental brief with this court.

The State did, however, raise in its initial brief with this court the argument that defendant failed to preserve an adequate record as to the race of the venirepersons excluded by the State. This argument is based upon the principle that a defendant may not challenge a State's peremptory challenge as being racially motivated unless there is evidence in the record that establishes the race of the excluded juror. (*People v. Evans* (1988), 125

Ill. 2d 50, 62.) In *Evans*, the parties had stipulated that five venirepersons stricken by the State had been black. The defendant in *Evans* also claimed on appeal that a sixth excluded juror had been black. This court held that defendant's challenge to the exclusion of the sixth juror was waived because there had been no evidence in the record that established the juror's race. (*Evans*, 125 Ill. 2d at 62.) However, there was no waiver because of a failure to make a record in *Evans* with respect to the venirepersons that the parties had agreed were black.

Our review of the record in this case indicates that both defendant and the State agreed at the *Batson* hearing that 15 of the 20 venirepersons stricken by the State were black. Thus, as was the case in *Evans*, defendant has not waived his right to challenge the State's exclusion of these 15 jurors. There was a dispute, however, concerning the race of two other venirepersons excluded by the State. Although nothing in the record established the race of these venirepersons, the trial court at the *Batson* hearing, based upon defendant's representations, found that they had been black. In light of our decision in *Evans* (which, we note, was decided after the *Batson* hearing in this case had been conducted), we conclude that it was error for the trial court to have gone beyond the record to determine the race of the two disputed venirepersons. Accordingly, the trial court should only have considered the State's exclusion of the 15 venirepersons that the parties agreed were black in determining whether defendant established a *prima facie* case of discrimination. See *Evans*, 125 Ill. 2d at 62.

Our conclusion that the trial court erred in considering the two additional venirepersons in assessing defendant's *prima facie* case, however, does not require us to reverse the trial court's finding that defendant established a *prima facie* case. In *People v. McDonald* (1988), 125 Ill. 2d 182, 196, this court explained that a *prima*

*facie* case may be established where a prosecutor has exercised "a 'pattern' of strikes against black" veniremen (quoting *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723), or where a prosecutor has exercised "his peremptory challenges against a group of veniremen being otherwise 'as heterogeneous as the community as a whole,' sharing race as their only common characteristic" (quoting *People v. Wheeler* (1978), 22 Cal. 3d 258, 280, 583 P.2d 748, 764, 148 Cal. Rptr. 890, 905).

In *McDonald*, this court rejected an argument that the trial court should have only considered the eight black venirepersons who had testified at the *Batson* hearing in that case, rather than all 16 blacks who had been stricken by the State, in assessing defendant's *prima facie* case. (*McDonald*, 125 Ill. 2d at 197-98.) This court went on to state, however, that:

> "Even assuming that our review were limited to the veniremen who actually testified at the *Batson* hearing, we would still be compelled to find that defendants established a *prima facie* case of discrimination. Our review of the record indicates that the heterogeneity of the stricken veniremen does not change by merely reducing their number by eight. Again, the pattern of strikes the prosecutor exercised. against these eight veniremen, along with the fact that they share race as their only common characteristic, compels us to conclude that defendants established a *prima facie* case of discrimination." *McDonald*, 125 Ill. 2d at 198.

In the present case, the 15 black venirepersons stricken by the State ranged in age from 19 to 59 and consisted of 12 women and 3 men. Their occupations, which were also diverse, included the following: steelworker, hostess, therapist, housekeeper, forklift operator, nurse, secretary, and personnel manager. Thus, the record demonstrates a pattern of strikes by the State against 15 venirepersons whose only common characteristic was that they were black. Accordingly, we agree

with the trial court that defendant established a *prima facie* case of discrimination by the State in its use of peremptory challenges. We turn now to defendant's arguments.

Defendant first argues that the prosecutor in the case, who testified as the State's witness at the *Batson* hearing, should have been required to testify under oath and be subject to cross-examination. We recently rejected this same argument in *People v. Young* (1989), 128 Ill. 2d 1, 24-26, a case decided while this appeal was pending, and, for the reasons stated in *Young*, we similarly reject it here.

Defendant's second argument is that the trial court erred in finding that the State rebutted defendant's *prima facie* case of discrimination. Under *Batson*, once a *prima facie* case of discrimination has been established, the State has the burden of coming forward with a neutral explanation for excluding each black venireperson which is "related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Although the State's explanations need not rise to the level justifying a challenge for cause, a mere assertion that the prosecutor acted in good faith or without a discriminatory motive will not suffice. (*Batson*, 476 U.S. at 97-98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) Furthermore, the State cannot meet its burden by stating that the challenges were based upon an assumption that the venirepersons would be sympathetic toward defendant because of their shared race. *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.

Once the State has come forward with its reasons for striking the venirepersons, the trial court must then determine whether the explanations are sufficient to rebut defendant's *prima facie* case. To do so, the trial court must make "a sincere and reasoned attempt to evaluate the prosecutor's explanation in light of the circum-

stances of the case." (*People v. Hall* (1983), 35 Cal. 3d 161, 167, 672 P.2d 854, 858, 197 Cal. Rptr. 71, 75.) Because this determination is a matter of fact, turning largely on questions of credibility, the trial court's findings must be afforded great deference (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21) and will only be reversed if against the manifest weight of the evidence (*People v. McDonald* (1988), 125 Ill. 2d 182, 199). We are also mindful, however, that the exclusion of even just one minority venireperson on account of race is unconstitutional and would require reversal of the conviction below. (*McDonald*, 125 Ill. 2d at 200.) We therefore must examine the explanations offered by the State for excluding each of the 15 black venirepersons from serving on the jury.

We note initially that the trial court found that four venirepersons were stricken from the jury because they had relatives who had been defendants in criminal cases. A fifth member of the venire was excluded because she was "sickly and disabled" and therefore would not be able to pay attention throughout the trial. A sixth venireperson was excluded because her job involved interpreting court procedures and policies, and the prosecutor thought she would try to do the same for the other jurors. Finally, two other venirepersons were excluded from the jury because they were single and unemployed and lacked ties to the community. One was a 19-year-old man who lived with his parents, and the other was a 47-year-old woman who lived in an apartment with her two adult sons, one of whom was also unemployed. Defendant does not argue, and our review of the record does not indicate, that any of these explanations were pretextual or not supported by the evidence.

The ninth member of the venire excused from serving on the jury was described by the prosecutor as being a "meek and sleepy" juror who did not answer questions

in a forthright manner. The prosecutor also felt uncomfortable with her demeanor. Defendant argues, and we agree, that explanations which focus upon a venireperson's body language or demeanor must be closely scrutinized because they are subjective and can be easily used by a prosecutor as a pretext for excluding persons on the basis of race. (See *People v. Charron* (1987), 193 Cal. App. 3d 981, 991, 238 Cal. Rptr. 660, 666-67.) However, the trial court in this case stated that it was aware of the problems posed by subjective, demeanor-based explanations for excluding venirepersons. As a result, the court closely scrutinized the State's explanations and nothing in the record here indicates to us that the trial court's finding was erroneous.

A tenth venireperson was stricken from the jury for three reasons. The first was that she lived in Hyde Park, a neighborhood in Chicago whose residents, the prosecutor felt, were more scholarly and open to new ideas than other Chicagoans. The prosecutor believed that these traits made Hyde Park residents unsuitable for jury duty because they would be less likely to base their findings of fact on the evidence in the case than other Chicagoans. The venireperson was also excused because her husband worked in the mental health field and because the way she described her job struck the prosecutor as being pretentious.

Defendant argues that the explanation based upon the venireperson's Hyde Park residence was insufficient to meet the State's burden of proof. Citing *State v. Slappy* (Fla. App. 1987), 503 So. 2d 350, defendant claims that the State cannot rely upon assumptions concerning traits allegedly possessed by a broad group of persons unless the State can show that (1) there is some element of truth supporting those assumptions and (2) those particular traits are possessed by the venireperson being excluded. Thus, defendant argues that the State

must show that Hyde Park residents actually do tend to be scholarly, open to new ideas and not likely to base their findings of fact on evidence, *and* that Alexander shared these traits. We disagree.

The Supreme Court in *Batson* instructed that the procedure to be followed in a hearing on the issue of a prosecutor's discriminatory use of peremptory challenges should be similar to the one utilized in Federal Title VII employment discrimination cases. (See *Batson*, 476 U.S. at 94-98 nn.18-21, 90 L. Ed. 2d at 86-89 nn.18-21, 106 S. Ct. at 1721-24 nn.18-21 (citing Title VII cases).) Under Title VII, once the plaintiff has made out a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for his action. (*Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 257-58, 67 L. Ed. 2d 207, 217-18, 101 S. Ct. 1089, 1096.) The plaintiff may then attempt to demonstrate that the proffered explanation is merely pretextual, hiding the defendant's true discriminatory motive. (*Burdine*, 450 U.S. at 257, 67 L. Ed. 2d at 218, 101 S. Ct. at 1096.) Similarly, in *Batson* the Court stated that once a defendant makes out a *prima facie* case of discrimination, the prosecutor need only "articulate a neutral explanation related to the particular case to be tried." (*Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723.) The defendant may then attempt to rebut the prosecution's explanation as being pretextual. (See *People v. Young* (1989), 128 Ill. 2d 1, 27.) At the conclusion of the hearing, the trial court has the duty to weigh the evidence and "determine if the defendant has established purposeful discrimination." *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88-89, 106 S. Ct. at 1724.

The two *elements* that defendant argues the State is *required* to show with regard to peremptory challenges based on a venireperson's membership in a group—(1)

that the group possesses the undesirable traits and (2) that the venireperson also possesses those traits—are merely important *factors* that the trial court *should* consider in evaluating the legitimacy of the explanation articulated by the State. For example, if the State excluded an accountant from the jury solely because of the State's belief that accountants tend to be politically liberal and sympathetic to individuals, and it was demonstrated that there was no basis for this assumption about accountants, then the trial court might conclude that the State's explanation was pretextual. Similarly, if the accountant in the above scenario were excused, and the evidence during *voir dire* clearly demonstrated that the accountant-venireperson did not share the traits of liberalism and sympathy toward individuals, the trial court again might find that the State's explanation was pretextual.

In the present case, the trial court judge, who stated that he was familiar with the Hyde Park neighborhood, having attended law school and worked there for a number of years, concluded that there was some basis for the State's assumptions about Hyde Park residents and so accepted the State's explanation for striking Alexander. Although we might not agree, we do not find that the court's conclusion was contrary to the evidence.

The eleventh person excluded from the jury was stricken because he was a steelworker who had previously been a schoolteacher and had done graduate work in education. This job change from teacher to steelworker struck the prosecutor as strange and something which raised questions as to what the venireperson's feelings or prejudices might be. Furthermore, the venireperson had been a music major in college and was married to a schoolteacher. The prosecutor explained that he generally excused schoolteachers and spouses of schoolteachers because they tend to be sympathetic toward in-

dividuals and give them the benefit of the doubt. The prosecutor also felt that teachers tend to go beyond the law and the restrictions placed upon them by trial judges when they serve as jurors. The prosecutor also stated that he generally excluded musicians because they tend to be creative and willing to move beyond the strictures of the law.

Defendant argues that the State's reasons for excluding the eleventh venireperson should be rejected for several reasons. First, defendant asserts that the venireperson met all of the general criteria that the State itself said it used for selecting jurors. He was a 53-year-old married man with seven children. He owned the home that he had lived in for 15 years and he worked at the same job for the past 14 years. Thus, according to defendant, the venireperson clearly had strong ties to his community. Second, defendant asserts that the State's concern about teachers serving on the jury is without merit because the State allowed a white teacher to serve on the jury. Finally, defendant, in an argument we have already rejected, claims that the State was required to show that teachers and musicians in general, and this venireperson in particular, possess the traits which were the basis for the peremptory challenge.

In *People v. Young* (1989), 128 Ill. 2d 1, 23, we observed that if a prosecutor rejected a minority venireperson for possessing certain characteristics, but did not reject a white venireperson sharing those same characteristics, "it does not follow that this in itself shows that the prosecutor's explanations were pretextual." We explained that:

"Though a part of the prosecutor's explanations may have been applicable to white jurors who were not challenged, the white jurors may have, in some other respect, exhibited a trait which the prosecutor reasonably could

have believed would make him or her desirable as a juror." (*Young*, 128 Ill. 2d at 23-24.)

Likewise, the converse is true as well. Though a minority venireperson may otherwise possess all of the traits which the State is looking for in a juror, he may possess an additional trait which makes him undesirable. On the other hand, although it is not conclusive, evidence that a stricken minority venireperson possessed the same characteristics as a nonminority juror on whom the State chose not to exercise a peremptory challenge should certainly be given great weight by the trial court in evaluating the State's explanations. See *People v. McDonald* (1988), 125 Ill. 2d 182, 199-200.

In the present case, there is little merit to defendant's contention that, since the State allowed a white teacher onto the jury, the State's explanation was pretextual. Our conclusion is based upon the fact that by the time the white teacher was questioned during *voir dire*, the State had exercised all of its peremptory challenges. As a result, the State had no choice as to whether or not it should exercise a peremptory challenge. Consequently, no inference of discrimination arises in this case from the fact that a white teacher served on the jury.

The trial court agreed that there may have been something suspicious about a person who was a teacher, and who had even done graduate work in education, leaving the teaching profession to take a job as a steelworker, an occupation described by the trial court as being a "job of conceivably a lesser status." We cannot say that this finding of fact by the trial court is against the manifest weight of the evidence.

The twelfth venireperson excluded by the State was the second to last venireperson examined on April 23. At the end of the day, the first panel of four jurors was selected. All of the other members of the venire who had

been questioned that day, with the exception of this twelfth venireperson, were excused. The next day, 11 more venirepersons were examined before any further challenges were allowed. The prosecution explained that by this time he could recall little about the twelfth venireperson. On the other hand, he had a fresh recollection of the 11 jurors that had been questioned that day. Due to this lack of recollection and therefore lack of information concerning the twelfth venireperson, the prosecutor exercised a peremptory challenge. The trial court found that this explanation rebutted defendant's *prima facie* case.

Citing *Batson*, defendant argues that the State's explanation was insufficient to rebut defendant's *prima facie* case because it was not " 'clear and reasonably specific.' " (*Batson*, 476 U.S. at 98 n.20, 90 L. Ed. 2d at 88 n.20, 106 S. Ct. at 1723 n.20, quoting *Texas Department of Community Affairs v. Burdine* (1981), 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.) According to defendant, the State's explanation essentially amounted to an admission that it had no explanation.

Defendant misconstrues the State's explanation. While it is certainly true that the State cannot rebut a *prima facie* case of discrimination by stating that it does not know why it exercised its peremptory challenges (see *Batson*, 476 U.S. at 98, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723 ("prosecutor [may not] rebut the defendant's case merely by denying that he had a discriminatory motive")), that is not what the State is attempting here. Instead, the State in this case knew precisely why it exercised its challenge: the State exercised its challenge because due to the timing and order of questioning during *voir dire*, the prosecutor had lost his recollection of the twelfth venireperson. As a result, the prosecutor did not have enough information about the venireperson to

feel comfortable with having her on the jury. This explanation is race-neutral, clear and reasonably specific.

Nevertheless, defendant argues that such an explanation should not be allowed because otherwise the State could always justify its use of peremptory challenges by claiming that it lacked sufficient recollection; thus making a mockery of *Batson*. We do not share defendant's fears, however, because such an explanation will usually only be credible where a unique set of facts, such as those that occurred in this case, is present. Unless such facts are present, we are confident that defendants will be able to prove, and trial courts will find, that explanations based upon a lack of recollection are pretextual.

The thirteenth person excused by the State worked as a barber and as a forklift operator. The prosecutor stated that he thought that the venireperson would probably have a loss of income if he had to serve on the jury. The prosecutor also stated that he excluded the venireperson because the venireperson's wife was a schoolteacher. However, the prosecutor testified that the "main reason" he exercised a peremptory challenge "was not because he [the venireperson] was married to a teacher." Rather, it was because the venireperson had a friend who was a politician who also happened to be a lawyer. That the prosecutor was concerned about the fact that the venireperson's friend was a politician, rather than the fact that he was a lawyer, is demonstrated by the following colloquy from the *Batson* hearing:

> "[PROSECUTOR]: When asked about whether [the venireperson] knew any lawyers, he responded that he knew one. He was a friend by the name of Fred ***. Your Honor indicated in the record that you seemed to know that individual and asked, wasn't he a city councilman, and—

THE COURT: Actually, this juror lived in Evanston. I think the lawyer's name was \*\*\*. I don't know how the name Fred got in the record.

[PROSECUTOR]: I recall there was a discussion about, you know, the lawyer that he mentioned and the fact he was a city councilman, and there was some smiling between the two of you, and the fact that he was impressed or whatever, that you recognized or knew that person that he had mentioned.

That left me with the thought about, who is this [friend]. He's obviously a political person in Evanston. I did not know him. I didn't know if he was a candidate or a politician that was interested in one specific issue or no issues; if he was a person that was a pro-abortion or ban-the-bomb or whatever.

I did not know this man, I did not know his politics. The contact between [the venireperson] was left very up in the air between [the venireperson and the friend] who is a friend or an associate. I believe he used the words, both friend and associate.

So again, I had a situation where I did not know the importance of [the friend] in [the venireperson's] life, and I thought it best, and I thought it best, because of that lack of knowledge, to exercise a peremptory challenge."

The trial court, in its oral findings of fact, stated that the venireperson "related that [the friend] was his friend and I think that is a justification for using a peremptory challenge; the same reason that the Defense could, if a person said they had a friend who was a state's attorney." The trial court thus apparently found that the State was justified in its use of a peremptory challenge because the venireperson had a friend who was a criminal defense attorney. This reading of the court's finding is underscored by the fact that the court, during defense counsel's closing argument at the *Batson* hearing, responded to defendant's claim that the State's explanation was pretextual, by asking "[w]hat about his friendship or association with a Criminal Defense attorney?"

We find the trial court's reliance upon the fact that the venireperson's friend was a criminal defense attorney to have been improper.

Under *Batson*, it is the State's burden to "articulate" "a 'clear and reasonably specific' explanation" for its use of peremptory challenges on minority venirepersons. (*Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88-89 & n.20, 106 S. Ct. at 1723-24 & n.20, quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096.) This burden, which the Court in *Batson* borrowed from Federal Title VII employment discrimination cases, "is not a heavy one." (*Uviedo v. Steves Sash & Door Co.* (5th Cir. 1984), 738 F.2d 1425, 1430.) However, the State is required to do more than merely list a series of facts. (See *Uviedo*, 738 F.2d at 1429-30.) The State must also articulate which facts were in fact the basis for the allegedly discriminatory act. (See *Uviedo*, 738 F.2d at 1429.) Furthermore, a court should not presume, or infer from the facts of the case, that an unarticulated neutral explanation exists. (See *Uviedo*, 738 F.2d at 1430.) Rather, a court must focus its inquiry on the reasons actually articulated by the State.

The problem with the court's finding is that although the prosecutor mentioned as a matter of fact that the venireperson's friend was an attorney, the State never clearly and specifically articulated that this fact was the reason that the State exercised a peremptory challenge. (We also note that nothing in the record from either *voir dire* or the *Batson* hearing, with the exception of the trial court's question of defense counsel, which was apparently based upon the trial court's personal knowledge of the friend, indicated that the friend was a criminal defense attorney.) Instead, as the colloquy from the *Batson* hearing demonstrates, the only "clear and reasonably specific" explanation for the peremptory challenge artic-

ulated by the State regarding the venireperson's friend was the fact that the friend was a politician, and that this fact somehow reflected upon the venireperson's political beliefs. As a result, it was improper for the trial court to have based its conclusion that the State rebutted defendant's *prima facie* case upon the fact that the venireperson had a friendship with a lawyer. See *Uviedo*, 738 F.2d at 1430 (In Title VII cases, "[i]t is beyond the province of a trial or a reviewing court to determine—after the fact—that certain facts in the record might have served as the basis for an employer's [discriminatory act]").

Although we find that the court's ruling was erroneous, we cannot at this point hold that the State used its peremptory challenges in a racially discriminatory manner. This is because there has not been a finding of fact regarding the explanations which the State did indeed proffer for excluding the thirteenth member of the venire. However, this court is in no position to make such a finding since such findings "largely will turn on evaluation of credibility" (*Batson*, 476 U.S. at 98 n.21, 90 L. Ed. 2d at 89 n.21, 106 S. Ct. at 1724 n.21), and credibility determinations are more appropriately left to the trial court (*People v. Cheek* (1982), 93 Ill. 2d 82, 94; see also *People v. Hooper* (1987), 118 Ill. 2d 244, 257-58 (Clark, C.J., dissenting, joined by Simon, J.)). Accordingly, we must reverse the trial court's finding and remand to the trial court to reassess the evidence in the record and issue new findings of fact and conclusions of law in regard to the State's explanations for excluding the thirteenth venireperson.

The fourteenth venireperson was excluded, according to the prosecutor's testimony, because "she lived relatively close [within 3½ miles] to the area where this incident had occurred." The prosecutor further testified that:

"it was because of a lack of information and lack of knowledge [in particular, a lack of information about the venireperson's husband] that I did not feel I had a good handle on [the venireperson]. I did not find her to be the kind of a juror that I was going to exercise automatically in any way, a peremptory challenge, but it was because of other jurors that I wanted on my jury that I believe [she] was excused."

The trial court found that the State rebutted defendant's *prima facie* case because the court concluded that the venireperson lived within one mile of where defendant lived. According to the trial court, "in this case, [the distance between the venireperson's and defendant's residences would have to have been] within at least a mile, in order to use a peremptory challenge." We hold that this finding was erroneous.

In this case, the prosecutor testified that the venireperson lived near the scene of the crime; he never mentioned the fact that she lived near defendant. Nor was this fact raised by the State's Attorney arguing the case for the State at the *Batson* hearing. The only reference to defendant's address were general statements during the State's Attorney's opening and closing arguments that two addresses were important in the case: defendant's address and the scene of the crime. The State did not, however, specify that the venireperson in particular lived near defendant. The court's finding that her address was within one mile of defendant's address was not based upon the record. Instead, it may have been based upon the court's personal knowledge. Thus, the State never articulated that the reason the venireperson was excluded was the fact that she lived near defendant. Accordingly, the trial court should not have considered this fact in assessing the State's explanation for its peremptory challenge. We therefore must remand to the

trial court to issue new findings of fact and conclusions of law regarding the fourteenth venireperson.

The final venireperson who was excluded by the State had a husband who was unemployed. The prosecutor also explained that the venireperson's son had testified in court as a victim of an armed robbery and the venireperson was not asked during *voir dire* what the result of the case had been. As a result, the prosecutor did not know the disposition of the case or whether the venireperson had been satisfied with the treatment her son had received. The prosecutor concluded his testimony about the venireperson by stating that he excluded her because "I did not feel I had a great amount of knowledge regarding [her]. Her ties to the community seemed to be tenuous, and in comparison to the other jurors I was considering at that time, I did exercise a peremptory challenge."

The trial court failed to make a specific finding regarding the State's exclusion of this final venireperson. In the supervisory order remanding this case for a *Batson* hearing, this court instructed the trial court "to make appropriate findings of fact and conclusions of law." One of the purposes of requiring a trial court to make findings of fact is "to provide appellate courts with a clear understanding of the basis of the trial court's decision" (*Bartsh v. Northwest Airlines, Inc.* (7th Cir. 1987), 831 F.2d 1297, 1304) so as to allow for "meaningful" appellate review (*Gupta v. East Texas State University* (5th Cir. 1981), 654 F.2d 411, 415).

This court recently held in *People v. Mack* (1989), 128 Ill. 2d 231, 245-46, that the trial court's explicit finding in that case that the facts in the *Batson* hearing were not in dispute, and that all of the State's explanations for exercising peremptory challenges were legitimate, was sufficiently specific to allow for adequate appellate review. In the present case, however, the trial court

made no explicit finding that the facts were not in dispute. Moreover, unlike in *Mack*, where the trial court found that all of the State's explanations were legitimate, the trial court here was silent on the question of the State's explanations for excluding the final venireperson. Accordingly, the trial court's findings here are not sufficiently specific to provide us with an adequate basis to review the court's decision. We therefore remand to the trial court to make specific findings of fact and conclusions of law for this final venireperson.

We note in closing that many of the State's explanations for excluding these last three venirepersons are based upon the fact that the State lacked certain information about them. In general, such explanations should be closely scrutinized since they can be easily utilized as a pretext for discriminatory challenges. (See *People v. Turner* (1986), 42 Cal. 3d 711, 727, 726 P.2d 102, 111-12, 230 Cal. Rptr. 656, 665-66.) Courts, in evaluating such explanations, should consider whether the State made any attempt at discovering the unknown information (see *Turner*, 42 Cal. 3d at 727, 726 P.2d at 111-12, 230 Cal. Rptr. at 665-66) by, for example, requesting that supplemental questions be asked during *voir dire* (see 107 Ill. 2d R. 234). Similarly, the State's explanation that two of the venirepersons were challenged because they were less desirable than other potential jurors should also be closely scrutinized since (1) both met the very criteria which the State itself stated it looked for in potential jurors: both were married with children and had been employed at the same job for a number of years (and one was a homeowner), and (2) the State failed to explain what characteristics made other potential jurors more attractive. In assessing this second explanation, the trial court should attempt to ascertain who the other venirepersons were who were being considered at the time the State exercised its challenges and compare

their characteristics with those of the excluded venire-persons.

In conclusion, therefore, we agree with the trial court that defendant established a *prima facie* case of discrimination. We also agree that the State rebutted defendant's *prima facie* case for 12 of the 15 black venirepersons challenged by the State. We reverse, however, the trial court's conclusion that the State rebutted defendant's *prima facie* case regarding the State's exclusion of the three venirepersons described above. We retain jurisdiction and remand the case to the trial court to issue and file with the clerk of this court, in writing, new findings of fact and conclusions of law regarding the State's explanations for excluding the three venirepersons described above. The trial court shall make its findings based upon the views expressed in this opinion and upon the evidence and arguments that were already presented at the *Batson* hearing. Neither the State nor defendant shall be allowed to present any further evidence or argument on this issue in the trial court below.

## CONCLUSION

This opinion holds, therefore, that defendant's death sentence is vacated, his convictions and nondeath sentences are conditionally vacated subject to reinstatement, and the cause is remanded to the circuit court of Cook County for the trial court to issue new findings of fact and conclusions of law regarding the State's explanations for excluding the three black venirepersons described in this opinion. If, after reconsidering the evidence in light of this opinion, the trial court finds that the State has failed to rebut defendant's *prima facie* case, a new trial shall be ordered. If retrial is not required, defendant's convictions and nondeath sentences will be reinstated and the trial court will be directed to

conduct a new sentencing hearing on the murder conviction, in accordance with this opinion.

> *Death sentence vacated; convictions*
> *and nondeath sentences conditionally*
> *vacated subject to reinstatement;*
> *cause remanded, with directions.*

JUSTICE RYAN, concurring in part and dissenting in part:

Generally, with the exceptions noted herein, the majority opinion does a commendable job of analyzing and resolving the issues raised by the defendant on this appeal. I concur in those parts of the opinion, and dissent only from the finding that it was error to have permitted the introduction of evidence concerning the shooting of Gary Green at the aggravation and mitigation phase of the sentencing hearing, and from that part of the opinion which remands the *Batson* issue for further hearing as to three jurors excused by the State by the use of peremptory challenges.

As to the introduction of evidence concerning the killing of Gary Green in 1969, it is important to remember that this evidence was introduced at the second phase of the sentencing hearing. That hearing was held before the court without a jury. At the first phase of that hearing, the court found the defendant eligible for the death penalty, based on the presence of the statutory aggravating factor that the murder had been committed in the course of an armed robbery. (Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6).) At the second phase of the sentencing hearing, evidence in aggravation and mitigation was introduced. One of the matters in aggravation which the State introduced at the second phase of the hearing was the 1969 killing of Gary Green. The majority opinion holds that the evidence of this killing should have been excluded because of the State's decision to nol-pros that

charge, and because the trial court's reliance upon the 1969 killing as an aggravating factor was misplaced. I do not agree. The killing of Gary Green was not presented to establish a second murder to qualify the defendant for the death penalty. (See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(3).) It was presented to prove a matter in aggravation. It was, therefore, not necessary to establish that the defendant had *"murdered"* Gary Green. The fact that the court, in considering factors in aggravation and mitigation, referred to the "murder" of Gary Green is not significant. The court there used the word "murder" as synonymous with "kill." As the general context of the judge's statement indicates, he simply found that the defendant killed Gary Green in 1969, which along with other evidence of defendant's participation in the fray, such as firing a gun twice, were proper bits of relevant evidence bearing on defendant's violent nature.

McDonald was the only witness who testified at the sentencing hearing as to actually seeing the defendant fire a gun. He stated that the defendant had a rifle, but ballistics evidence indicated that the bullet was not fired by a rifle. This contradiction is not destructive of McDonald's testimony and was a matter to be resolved by the trial judge. McDonald could have been mistaken or the ballistics evidence could have been in error. It appears that only one other person was with the defendant on the other side of the wall from the victim, his brother, and McDonald. The evidence indicates that only the defendant fired a gun. The trial judge acknowledged the problems surrounding this type of a case, but concluded that "the evidence is positive and credible that the defendant did kill Mr. Green." It was the trial court's function to resolve conflicts in the evidence and to draw inferences therefrom. (See *People v. Stewart* (1984), 105 Ill. 2d 22, 66.) There is ample evidence in the record to support the trial court's determination. It

should not, therefore, be lightly overturned. (*People v. Brownell* (1980), 79 Ill. 2d 508, 539-40.) Also, I do not think that the fact that the State nol-prossed the charge against the defendant for the murder of Gary Green supports the holding of the majority opinion. It appears that McDonald, the only person who saw the defendant with a gun, did not testify at the *nolle prosequi* hearing. Gary Green's brother, Rochester, testified at that hearing that someone by the name of "Rat" killed his brother. At the sentencing hearing in this case, Rochester explained his testimony at the *nolle prosequi* hearing. He stated he did not actually see the person who shot his brother. He did not know the identity of the person by the name of "Rat" and stated that he had simply presented to the trial judge, at the *nolle prosequi* hearing, information he had picked up on the street. This testimony, as well as that detailed above, was all before the sentencing judge when he concluded that defendant had killed Gary Green. The evidence surrounding that killing was not unreliable, as the majority opinion concludes. It is no more unreliable than is any other evidence that is in conflict or may have been contradicted. We do not remove from the fact finder's consideration evidence simply because it may be in conflict with other evidence, or may have been contradicted by previous evidence.

I likewise do not think that the trial court erred in excluding statements made by the prosecutor as his reasons for nol-prossing the 1969 murder charge. In refusing to consider the prosecutor's reasons, the court properly stated that "[t]here's no importance to what the attorneys felt," and also noted in its findings that "[i]t seems that the State did not have Mr. McDonald at that time." Thus, the court acknowledged that it had before it more evidence than was available to the prosecutor at the time the previous charge was nol-prossed, and that the reason why the previous charge was dismissed was

not relevant to or probative of the issues before the court at the sentencing hearing. I do not think the defendant was prejudiced by the exclusion of this evidence.

For these reasons, I dissent from the majority opinion's holdings on the various issues arising from the consideration by the court at the second phase of the sentencing hearing of matters pertaining to the killing of Gary Green in 1969.

As to the *Batson* issues, I dissent only from the majority opinion's holding which remands the matter to the trial court for a further *Batson* hearing as to jurors referred to in the majority opinion as the 13th, 14th and 15th persons excused by the State. I find that the opinion's analysis of the *Batson* issues relating to the other jurors who had been peremptorily excused was thorough, and legally and logically sound.

I believe that the record reflects facts articulated by the State which support a neutral explanation for the exercise of peremptory challenges to excuse jurors referred to in the opinion as the 13th, 14th and 15th persons excused peremptorily by the State. I feel that the majority misread *Uviedo v. Steves Sash & Door Co.* (5th Cir. 1984), 738 F.2d 1425. The majority opinion quotes page 1430 of that case as follows:

" '[i]t is beyond the province of a trial or reviewing court to determine—after the fact—that certain facts in the record might have served as the basis for an employer's [discriminatory act].' " (129 Ill. 2d at 185.)

This statement does not mean that this court, or any reviewing court, is precluded from considering clearly articulated reasons for the use of a challenge which appeared in the record just because the trial court made a finding as to the legitimate exercise of a challenge which is not supported by the record, or made no specific finding as to an articulated reason. In *Uviedo*, the Federal

magistrate had found that the plaintiff had established a *prima facie* case of discrimination, that the defendant had rebutted the *prima facie* case, and that the plaintiff had failed to show that the reasons articulated by the defendant were merely a pretext. The Court of Appeals held that although there may be facts in the record which support the finding of the magistrate, "[t]he difficulty here, however, is that defendant never articulated to the magistrate that these *were in fact* the reasons for the particular challenged action." (Emphasis in original.) (738 F.2d at 1429.) The language quoted in the majority opinion in the context of the *Uviedo* case does not preclude a reviewing court from considering reasons that are in the record which the prosecutor articulated for the exercise of peremptory challenge, whether or not they are the reasons given by the trial court for finding that the State had given a neutral explanation for the exercise of the challenge. *Uviedo* only requires us to hold that although the record may disclose an explanation for the exercise of a challenge, that explanation cannot be found to be adequate by either the trial court or a court on review, unless the prosecutor articulated that as a reason for exercising a peremptory challenge. This court can, and for the sake of judicial economy should, evaluate the reasons articulated by the prosecutor for the exercise of peremptory challenges and should determine whether the reasons given constitute a neutral explanation for the exercise of the challenges. We need not be limited to considering only the findings and facts in support thereof given by the trial court.

As to the 13th juror excused by the State, the majority opinion holds that the trial court's reliance upon the fact that the venireperson's friend was a criminal defense lawyer was improper because the State had never clearly articulated that this fact was a reason that it exercised a peremptory challenge to excuse that juror. It

may be that the State did not articulate as a reason for excusing this juror the fact that he had a friend who was a *criminal defense* lawyer, but the prosecutor did clearly state, as a reason for excusing that juror, that the juror had a friend who was a lawyer and a city councilman, as noted in the explanation by the prosecutor quoted by the majority opinion. This relationship, coupled with the fact that the prosecutor did not have further information concerning how that relationship might influence the juror, caused him to use a peremptory challenge to exclude the juror. I think this is a perfectly valid neutral explanation for the use of a peremptory challenge, which this court is capable of evaluating without sending the case back for another hearing.

Apparently, the defendant was not concerned about the finding by the trial court that the juror's friend was a *criminal defense* lawyer, because this erroneous finding is not mentioned in the defendant's brief. The defendant, in the statement-of-facts section of his brief, sets forth the reason stated by the prosecutor for exercising peremptory challenges and the findings of the court as to each of the 17 jurors whose challenges were questioned. As to the challenge to the juror we are now considering, the defendant states, in his brief, that the prosecutor said he excused that juror "primarily because he had a friend *** who was a lawyer and a city councilman." The defendant's brief states that the court found that the prosecutor excused this juror "because he knew an Evanston city councilman who was also a lawyer." In the argument section of the defendant's brief, the reasons for excusing jurors and the findings of the court are specifically argued as to six of the jurors that were excused by the State. Also, two others are generally referred to without detailed discussion. However, nowhere in the defendant's brief was any argument made concerning the adequacy of the articulated reasons for the

challenge of this 13th juror, or the finding of the court in relation thereto which the majority opinion now finds to have been erroneous.

As to the juror referred to in the opinion as the 14th venireperson excused by the State, the opinion states that the finding of the court that the juror lived within a mile of the defendant's residence was erroneous. It is interesting to note that the defendant's brief argues that the State's explanation for why it excused this juror "was nearly identical to its explanation for why it excused [the 12th venireperson excluded by the State]." The majority opinion holds that the explanation for the exclusion of the 12th venireperson was adequate, that is, that "the prosecutor did not have enough information about the venireperson to feel comfortable with having her on the jury." 129 Ill. 2d at 181-82.

Since the defendant argues that the explanation for the 14th venireperson excused was nearly identical with that given for excusing the 12th venireperson, it would appear that the reason for approving the challenge to that juror would compel the approval of the challenge of the venireperson now under consideration. The majority opinion quotes the statement of the prosecutor as to his concern about his lack of knowledge as to this juror. (129 Ill. 2d at 186.) This lack of knowledge is what the defendant refers to in his brief as the reason that was nearly identical with that given for excusing the 12th venireperson.

The mere fact that the trial judge found that this juror lived within a mile of the defendant's *residence* instead of within 3½ miles of the *scene of the crime*, as the defendant asserts was the case, does not detract from the valid explanation of lack of adequate information articulated in the record by the prosecutor.

As to the final venireperson excluded by the State discussed in the majority opinion, my colleagues note

that the trial court failed to make a specific finding regarding the State's exclusion of this juror and held that in view of this, there are no sufficient findings in the record to provide a basis for appellate review. (129 Ill. 2d at 187-88.) As noted in the majority opinion, this juror was a woman whose husband was unemployed and whose son had been a victim of an armed robbery and had testified at the trial of his assailant. The prosecutor, at the *Batson* hearing, stated that he did not know the outcome of that case or whether this juror was satisfied with the treatment her son had received. The prosecutor stated that the *voir dire* of this juror was sketchy and that he did not have a lot of information about her, compared to the information he had as to other prospective jurors that he was considering at that time. It must be remembered that in this case the court conducted the *voir dire*. It is understandable that the prosecutor did not want to jeopardize his case by accepting this unknown quantity as a juror. Just as the lack of adequate information on which to base an informed judgment was considered in the majority opinion to be an adequate explanation for the exclusion of the 12th venireperson challenge by the State, it is likewise an adequate reason when articulated by the prosecution for the challenge of other jurors about whom the *voir dire* and the juror cards do not give sufficient information to permit the prosecutor to make an informed determination.

Although the court did not make any specific findings as to the validity of the prosecutor's explanation for excusing this juror peremptorily, it did make a general finding that the State had come forth with neutral explanations for its use of peremptory challenges.

In *People v. Mack*, the trial court, at the conclusion of a *Batson* hearing, failed to make specific findings as to the adequacy of the reasons stated by the prosecutor for the use of peremptory challenges. This court stated:

> "The judge's oral ruling and written order are sufficiently specific for our purposes here. The record contains the transcript of the explanations offered by the prosecutor. The judge found those explanations to be adequate and race neutral, and sufficient to rebut the defendant's *prima facie* case under *Batson*. There was no further need for the trial judge to enter findings with respect to each black member of the venire excluded by the prosecution." (*People v. Mack* (1989), 128 Ill. 2d 231, 245-46.)

The majority opinion attempts to distinguish *Mack* by saying that the trial court, in *Mack*, found that the facts were not in dispute, whereas, in our case the trial court made no specific findings that the facts were not in dispute. (129 Ill. 2d at 187-88.) This is a distinction without a difference. The record discloses whether or not the facts are in dispute, and this court can make that determination just as well as can a trial court. The holding in *Mack* is clearly controlling in this case. In *Mack*, we stated:

> "Although the credibility of the prosecutor's explanations for his conduct at the *voir dire* was in dispute, the underlying facts were not." (*Mack*, 128 Ill. 2d at 246-47.)

The same reasoning applies in our case, which contains no factual dispute as to the articulated reasons for the use of the peremptory challenges. It is only the sufficiency of these explanations that is in dispute, and this court is perfectly capable of deciding that question from the record.

For the reasons given, I find it unnecessary to remand this case to the trial court for a further *Batson* hearing as to these three venirepersons. The trial court found that the reasons articulated by the prosecutor for excluding these jurors were racially neutral. That finding is supported by the record and is not manifestly erroneous.

In closing, I wish to point out the needless additional delay and waste of judicial resources that will be occasioned by the majority opinion. The crimes in this case were committed February 10, 1983. The defendant's first brief was filed in this court August 10, 1985. As noted in the majority opinion, because of the holdings by the Supreme Court, it was necessary for us to remand this case for a *Batson* hearing, which we did in May 1987. The case is now before us for the second time, and we still have not disposed of the appeal. The majority opinion again remands the case for a further *Batson* hearing, following which it will again be appealed to this court for the third time. If we find that the peremptory challenges were properly used, under the holding of the majority opinion, the case will again be remanded to the trial court for a new sentencing hearing, which could be held seven years or more after the original trial. Whatever penalty is imposed at the new sentencing hearing, another appeal will follow. If the penalty is death, the appeal will be directly to this court. If it is other than death, the appeal will be to the appellate court, with a petition for leave to appeal to this court. In any event, before the defendant's first appeal of his murder conviction is disposed of, this court and the trial court will each have considered this case four times. Of course, this will conclude only the first round. The defendant will then proceed again in the trial court under the provisions of the Post-Conviction Hearing Act (Ill. Rev. Stat. 1983, ch. 38, par. 122–1 *et seq.*). It is interesting to note that nowhere in the defendant's briefs does he profess his innocence or say that he did not commit these crimes. Also, he does not contend that the evidence was not sufficient to prove him guilty beyond a reasonable doubt.

I dissent from those portions of the majority opinion discussed above. I would affirm the defendant's convictions and sentences.

JUSTICE MILLER joins in this partial concurrence and partial dissent.