THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
EUGENE RHOINEY, Defendant-Appellant.

First District (1st Division)   No. 1—89—2891

Opinion filed June 28, 1993.—Rehearing denied September 27, 1993.

Michael J. Pelletier and Barbara Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Veronica X. Calderon, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Eugene Rhoiney and codefendant Angelo Roberts were charged with the first-degree murder of decedent, Stephen Edwards. Defendant was also charged with armed violence, aggravated unlawful restraint and concealment of a homicidal death. Prior to trial, the circuit court granted defendant's motion for severance, but denied his motions to quash his arrest and to suppress statements. A jury found defendant guilty of first-degree murder, and he was sentenced to natural life in prison without opportunity for parole. Defendant appeals his conviction and sentence. We affirm.

At trial, Officer Galbreth testified that on January 24, 1988, at approximately 9:45 a.m., he responded to a call concerning a body lying in the rear of the Jewel Foods Store at 3552 West Grand. Galbreth stated that it had snowed the previous evening and that the temperature was about 20 to 25 degrees. A Jewel security officer led Galbreth to the area where Jewel kept its trash bins. Galbreth noticed a white male's body lying facedown. Galbreth testified that there was a portion of a blue and white patterned bed sheet tied around the face of the male as a blindfold. There were also parts of a green, yellow and white striped bed sheet tied around decedent's neck, hands, knees and thigh area. After discovering the body, Galbreth called his supervisor, a detective from the violent crimes division, the mobile crime laboratory and the medical examiner.

When other police personnel arrived, the blindfold which was on decedent's head was removed. Galbreth testified that he observed bruises and marks on the decedent's face. The decedent's shirt was blood soaked and, when removed, revealed slices in the right side of the decedent's chest. Galbreth also saw gray duct tape around the decedent's elbow.

Next, Detective William Wendt testified that he was assigned to investigate decedent's homicide. Wendt's testimony regarding the decedent's body being bound with particular fabric of certain colors corroborates Galbreth's testimony. After the crime laboratory division informed Wendt of decedent's identity, he and his partner, Detective Pufpaf, went to decedent's last known address, 3841 West Adams, knocked on the door and defendant answered. The detectives identified themselves and inquired whether defendant knew decedent. Defendant replied that decedent lived in the basement of the building. The detectives told defendant that decedent was found dead. Defendant invited the detectives into the house.

Wendt testified that he met Janice Pierce and Sharon Sullivan when he entered the house. Pierce, the owner of the house, gave the detectives permission to see the decedent's room. The detectives went into the basement. There was a daybed directly outside of decedent's room. The detectives noticed a green, yellow and white striped bed sheet underneath the cover blanket. Wendt testified that it appeared to be of the same material as that found on decedent. The detectives confiscated that sheet, a pillowcase and a fitted sheet with a blue and white pattern. A roll of gray duct tape was also recovered from a tool box that was in a milk crate in decedent's room.

Defendant, Pierce and Sullivan agreed to go to the police station to be interviewed. Wendt interviewed defendant in the presence of Pufpaf. Defendant stated that he had known decedent for several years and introduced him to Pierce, who rented a room to decedent. Defendant said that a group of people watched the championship Tyson/Holmes fight at Pierce's house on January 22, 1988. Decedent and his girl friend, Carolyn Lewis, were there. Then, defendant told the detectives that early the following morning, he heard an argument between Lewis and decedent. Lewis accused decedent of using her car while she was asleep and stealing $20 from her. Lewis left Pierce's home around 6 to 7 a.m., but returned around 8:30 a.m. Upon returning, she told decedent that her video cassette recorder (VCR) was missing from her apartment and accused him of going to her apartment while she slept at Pierce's home and stealing her VCR. Defendant claimed that he tried to calm Lewis down by telling her that he

would attempt to find the VCR and by giving her $20. Lewis calmed down and left.

According to defendant, shortly after Lewis left, the telephone rang. Defendant answered the telephone. Defendant stated that the caller, who sounded like a black male, asked if there was "a white guy living in the building with you?" The caller then explained that "somebody stole my car and I found out its the white guy living in your building." Defendant stated that he then handed the telephone to decedent. After the telephone conversation, defendant says he inquired about what was happening. Decedent said that someone witnessed a car being stolen and the caller was going to bring a witness over to the house to determine if it was decedent. Next, defendant explained that decedent got into a beige station wagon with two black males. Defendant stated that he never saw decedent again after getting into that car.

Carolyn Lewis testified on behalf of the State. She stated that she had been decedent's girl friend since November 1987 and that on January 22, 1988, she and decedent went to decedent's room in Pierce's house, where she slept until she was awakened by decedent's voice coming from the bathroom. She heard Ray Robinson telling decedent to steal everything Lewis had. She put on her clothing and noticed that her car keys were not in her coat pocket where she had left them and that $20 was missing from her pants' pocket. As Robinson came out of the bathroom, she entered it and began arguing with decedent. Pierce came down to the basement and asked her what was happening. She explained and put on her coat to leave. Decedent followed her to the first floor. Defendant was there and asked her why she was upset. She explained.

Defendant ordered decedent to go back down to the basement and Lewis left and confirmed that her car had been moved. Upon arriving at her home, she noticed the VCR was missing. She called Pierce's house and told defendant that her VCR was gone, then took a shower and returned to Pierce's house. She told defendant that she wished to speak to decedent. Defendant went to the basement and got decedent. She confronted decedent regarding her missing money and VCR and moving her car. Decedent only responded that he needed the money. Then, defendant walked her to the door. She asked defendant to please keep decedent away from her because she never wanted to see him again. Defendant responded that she would not have to see him again.

The following Tuesday, Pierce telephoned her and told her that decedent was dead. Defendant also called her, wanting to know what

she had told the police. She refused to speak to him. Defendant explained that he was upset because the bed sheets which Lewis described to the police matched the sheet that the police found on the decedent. She stated that she would call defendant the following day. The next morning, she picked up defendant in her car. They discussed her conversation with the police.

Roosevelt Dyes testified that he knew Pierce for about two to three years. He also knew defendant and Robinson, who is Dyes' brother-in-law. On January 23, 1988, Dyes took Robinson to a currency exchange to cash his public aid check. Thereafter, they returned to Pierce's house. Lewis, decedent, defendant, Pierce and a person named Robert were there. Robinson and Dyes went to the basement, where Robinson was cooking heroin or cocaine. After about 10 to 15 minutes, decedent came to the basement. Robinson and decedent argued about whether the narcotics would be shared. Decedent picked up a stool and hit Robinson with it. The two began to fight. Defendant came down to the basement and hit decedent with a pipe on the back of his leg. In court, Dyes identified a State exhibit as the pipe which defendant had used. Decedent claimed that defendant had broken his leg. Defendant returned to the first floor carrying the pipe.

Dyes further testified that Robinson and decedent, again, began to fight. Again, defendant came to the basement. Defendant separated Robinson and decedent. Then, defendant started beating decedent with the pipe, hitting him on the head twice. Dyes stated that the two hits produced loud blows. After being hit, decedent crawled to a hallway and claimed he was getting dizzy. Dyes remembered blood was coming from decedent's head. Dyes testified that defendant said he would take decedent to the hospital. Defendant ordered everyone to leave the basement.

Next, Anthony Dandridge testified that he saw defendant on January 23, 1988, at approximately 10 p.m. Defendant requested that Dandridge come to Pierce's house and help him in the basement. Dandridge went to the house with defendant and saw Sullivan and Eddy, a relative of defendant, at the home. Dandridge and Eddy went to the basement and picked up bloody towels and put them in a plastic garbage bag. Dandridge noticed bloodstains on the floor in front of the bathroom. They mopped up the blood and took the garbage bag along with some bloodstained floor wood to the back seat of the 1988 red Buick defendant had been driving. Defendant and Eddy took a rolled-up rug from the basement and put it into the trunk of the car. Then, Eddy and Dandridge rode in the car with defendant to the alley behind Jewel. They threw the garbage bag out of the car. Defendant

gave Dandridge $2 to buy some dog food. Dandridge left defendant and Eddy in the car. After Dandridge returned with the dog food, defendant drove him home.

Detective Gene Harris testified that in late January 1988, he began to investigate the homicide of decedent. On January 29, 1988, he and his partner executed a search warrant on Pierce's house. The following are items found on the premises which were processed by the crime lab: (1) a pail containing sponges and scrub brushes; (2) bed sheets; (3) a pillow case found in decedent's bedroom; (4) a red blanket found on decedent's bed; (5) samples of a red rug on the top of the stairs leading from the basement; and (6) a small piece of decedent's mattress. The detectives noticed floor boards were missing in front of the bathroom.

Harris testified that he had a conversation with defendant on January 31, 1988. Harris' statement was the same as before. On March 18, 1988, Harris spoke with defendant again. Defendant stated that he was talking to decedent about stealing Lewis' money and got tired of decedent so he hit him on the legs twice with a pipe. Then, decedent lunged at defendant, so defendant hit him on the left side of the head with the pipe. Defendant returned to the first floor. Defendant, however, heard another argument, went to the basement and found decedent and Robinson fighting. Defendant pulled Robinson away from decedent. Defendant stated that he punched decedent in the back twice. Defendant and Robinson went to the first floor. A couple of hours later, decedent came upstairs and stated that he was going to retrieve Lewis' VCR even though he had sold it. Decedent left the house and returned at about 5 to 5:30 p.m.

Further, Harris testified that defendant stated that he left the house at 10 p.m. When he returned with Pierce at midnight, Sullivan, Robinson and Jackie Gaston were present. When Harris questioned defendant regarding why he originally stated that decedent left in a beige car with two black males, defendant answered that he felt like lying. On March 19, 1988, Harris recovered a pipe from the basement of Pierce's house. Defendant told essentially the same scenario to Assistant State's Attorney Decline Thompson.

Additionally, Harris interviewed Dyes on March 18, 1988. Dyes said that Angelo Roberts and Pierce were on the first floor when Robinson and decedent were fighting. Roberts was called to the witness stand but invoked his fifth amendment right against self-incrimination and refused to answer any questions regarding decedent's death.

Dr. Shaku Teas testified that she was a forensic pathologist for Cook County. On January 25, 1988, Teas performed an autopsy on decedent. Teas testified that decedent's ankles and thighs had been tied with a strip of torn bed sheet. Decedent's wrists were also tied. There were three different gags around decedent's mouth and neck. Decedent had multiple blunt force injuries to his head, as well as to his face and neck region. Decedent suffered multiple lacerations, abrasions, bruising and contusions on the right side of his head. In particular, there were three lacerations to the back left side of decedent's head. There were also abrasions on the left cheek and on the right side upper left eyelid. Decedent had faint bruises on his neck consistent with the gag being tied around it. Decedent's larynx had suffered hemorrhage in a few areas. This indicated that the gags were tied around decedent's neck while he still had a heart beat and was breathing.

Teas' internal examination revealed an extensive hemorrhage inside the scalp, located in the back portion of the head. According to Teas, this type of hemorrhage is indicative of blunt trauma. There were contusions in the interior surface lower portion and the top area of the brain. There was another hemorrhage on the corpus callosum portion of the brain, indicative of a severe blow to the top area of the head.

Decedent suffered a stab wound to each lung, thereby collapsing them. There were bruises on decedent's knees and behind them. There was extensive hemorrhaging behind the left knee. The backs of both hands were swollen and red, again, indicating that decedent was bound before he was dead.

Teas opined that, to a reasonable degree of medical certainty, the head injuries alone were sufficient to cause decedent's death. Decedent could have lived for 30 to 45 minutes after receiving the blunt trauma to the head. Further, decedent would have been able to speak for a short period thereafter. Decedent, however, would have eventually lost consciousness.

Christine Anderson testified as an expert in serology. Anderson testified that decedent's blood was found on his mattress, but obtained inconclusive results for the presence of blood on the sponges and scrub brushes. Anderson found no blood on the red rug.

Bob Berk, a criminalist with the Chicago police department's crime lab, compared the bindings received from the medical examiner to the sheets recovered by the police. Berk determined to a reasonable degree of scientific certainty that the sheets and bindings matched. Further, Berk opined that the nylon fibers, found on the

bindings, could have come from the carpeting at the top of Pierce's basement stairs. Berk found to a reasonable degree of scientific certainty, however, that the red nylon fibers collected from the blue printed pillow case originated from the carpeting at the top of Pierce's basement stairs. Additionally, Berk opined that the bindings contained fibers from the red blanket, and that trace material found in that blanket could have been from the carpeting at the top of the stairs. The hair retrieved from the sponges and brushes could have originated from decedent's head. The red nylon fibers recovered from the trunk were similar to fibers found in the red carpet.

Next, Pierce testified on behalf of defendant. Pierce stated that she was told that decedent hit Robinson with a stool. When defendant and she heard this noise, defendant went to the basement and returned shortly thereafter. Pierce also testified that she saw defendant at around 10 p.m. on January 22, 1988, at a party. They arrived at her house at about 11 p.m. Pierce went to the basement and saw no blood or bloody rags. Harris testified that when he interviewed Pierce she never mentioned being at a party with defendant.

Jackie Gaston also testified on behalf of defendant. Gaston testified that he saw decedent at a drug house and attempted to assist decedent in selling a VCR. Gaston's testimony was that he saw decedent at 6 to 7 p.m. at the drug house, but then contradicted himself and stated that he did not get to the drug house until 8 to 9 p.m. Gaston further testified that he arrived at Pierce's house at 9 to 10 p.m. that night. After Gaston requested money, defendant stated that he would give him some if he cleaned the basement. Gaston claims that he cleaned the basement and did not see any blood or decedent. Gaston also admitted that he pled guilty in 1982 to theft and unlawful use of a weapon, receiving two years in prison. At the time of trial, Gaston was serving a six-year sentence for theft and possession of a stolen motor vehicle.

After deliberating, the jury found defendant guilty of first-degree murder, but could not reach a unanimous decision for the imposition of the death penalty. Defendant was sentenced to natural life without parole.

Initially, defendant appeals his conviction on the ground that the State's use of its peremptory challenges to exclude blacks from the jury violated *Batson v. Kentucky* (1986), 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712. Defendant specifically argues that he was denied a fair trial because the circuit court abused its discretion by conducting a "collapsed" *Batson* hearing, wherein it improperly articulated race-neutral reasons for the exclusions on behalf of the State. Defendant

contends that this cause should be remanded for a "proper" *Batson* hearing.

In order to establish a *prima facie* case under *Batson*, a defendant must show that the State exercised peremptory challenges to remove veniremembers of a cognizable racial group and that the facts and any other relevant circumstances raise an inference that the State challenged the veniremembers because of their race. (*People v. Edwards* (1991), 144 Ill. 2d 108, 153, 579 N.E.2d 336, 353-54; *Batson*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712; *Powers v. Ohio* (1991), 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364.) The record indicates that the circuit court properly weighed the totality of the relevant circumstances. The circuit court found that defendant failed to show a pattern of strikes against a cognizable racial group, because those jurors who were struck exhibited characteristics, other than race, that are commonly viewed to be unfavorable to the State.

After the second panel of jurors had been selected, defendant moved pursuant to *Batson* that the State give race-neutral reasons for excluding blacks. In support of his *Batson* motion, defendant argued that the State had at that point used five of seven peremptory challenges to exclude blacks from the jury and that these veniremembers were similarly situated. The court stated for the record that two blacks were selected for the first panel and two blacks were selected for the second panel; thus, 50% of the selected jurors at the time of defendant's *Batson* motion were black. Thereafter, the court stated that there was "no invidious discrimination." The court explained its findings by stating:

"In my judgment, the challenges are being made with racial neutrality. On things like youth, somewhat idiosyncratic people. For instance, the boutique people. Was kind of different dressing, different appearing. Clipped kind of answers that I haven't heard in a while from an area that borders on, if not encompasses the University of Chicago which prosecutors have always been leery of for twenty-five years or more. And in my judgment, there has been no racial discrimination.

Another thing. I think on more than one of these challenges, opposition to the death penalty, but when I asked the jurors to conceive of some case where they could consider it, Speck and Manson pops. [*sic*] Up and it would obviously be fair to assume that if the State does not think that this case comes close to Speck or Manson, that juror is not going to end up if there is a guilty verdict, imposing the death penalty.

So, I'm not even going to demand that the State make a record."

Defendant, however, persisted, arguing that only two of the excluded jurors expressed problems with the death penalty. Defendant continued to argue that there was no difference between the excluded veniremembers and the selected jurors, except race. The court responded by stating:

"There's the one young black lady who had a one month employment at Montgomery Wards I think. So, you're right. She was employed, but there certainly is a difference between for instance being employed for twenty-five years and then employed for one month at a particular place. And there was a young white girl who was about 21 years old or twenty years old who was likewise challenged by the State because of—I would assume and I would challenge them because of there again, absence of wisdom of age."

Defendant cited *People v. Garrett* (1990), 139 Ill. 2d 189, 564 N.E.2d 784, to illustrate that the Illinois Supreme Court criticized a circuit court for "collapsing" the *Batson* hearing. Although on its face this statement is true, it is misleading. In *Garrett* defendant made a *Batson* motion stating that six of the seven peremptory challenges were black veniremembers. (*Garrett*, 139 Ill. 2d at 198, 564 N.E.2d at 785.) The supreme court commented that this might be enough to satisfy all the elements of a *Batson prima facie* case "except perhaps the critical, last element: whether these facts 'and any other relevant circumstances' raise an inference of purposeful discrimination." (*Garrett*, 139 Ill. 2d at 203, 564 N.E.2d at 791.) Even though the circuit court asked the State whether it wished to say anything about its challenges, and the State responded by explaining three of the challenges on seemingly race-neutral grounds, the supreme court held that defendant's submission of his *Batson* motion was "simply insufficient for the trial judge reasonably to find that a *prima facie Batson* case had been established." (*Garrett*, 139 Ill. 2d at 204, 564 N.E.2d at 791.) Defendant's attempt to use *Garrett* to imply that the supreme court mandates remanding cases similar to the instant one is unsuccessful because not only is such implication untrue, but the case at bar differs from *Garrett*.

■ In the case at bar the circuit court did not conduct a "collapsed" *Batson* hearing. A collapsed *Batson* hearing occurs when the circuit court requests that the *State* provide race-neutral reasons for its challenges prior to finding that a *prima facie Batson* case has been established. (See *People v. Hope* (1990), 137 Ill. 2d 430, 560

N.E.2d 849.) Here, the circuit court merely explained why defendant had failed to establish a *prima facie* case. The State did not provide race-neutral reasons for its challenges.

Defendant also relies on *People v. Harris* (1989), 129 Ill. 2d 123, 544 N.E.2d 357. In *Harris*, the circuit court found that the defendant had established a *prima facie* case of discrimination. Defendant quotes *Harris* for the proposition that "a court should not presume, or infer from the facts of the case, that an unarticulated neutral explanation exists. [Citation.] Rather, a court must focus its inquiry on the reasons actually articulated by the State." (*Harris*, 129 Ill. 2d at 184, 544 N.E.2d at 384.) There is a significant difference between *Harris* and the instant case. In *Harris* the circuit court found that the defendant had established a *prima facie* case of discrimination. In the case at bar, the circuit court found that defendant had failed to establish such a case. Defendant argues that the circuit court stated race-neutral reasons for the challenges on behalf of the State. The record, however, clearly indicates that the circuit court found that there was "no invidious discrimination" and went on to explain its findings.

Defendant cites another case in support of his argument that the circuit court abused its discretion by conducting a "collapsed" *Batson* hearing. Defendant correctly states that this court indicated that the determination of discriminatory use of peremptory challenges is based upon the "motives" of the prosecutor. (*People v. Harris* (1989), 182 Ill. App. 3d 114, 118, 537 N.E.2d 977, 979.) While the above statement is true, the circuit court must first determine if the defendant has established a *prima facie* case of discrimination. In the case at bar, the court found that defendant had failed to establish a *prima facie* case.

A trial court's determination that a defendant failed to establish a *prima facie* case of purposeful discrimination is a finding of fact and should not be overturned on review unless it is against the manifest weight of the evidence. (*People v. Brisbon* (1989), 129 Ill. 2d 200, 231, 544 N.E.2d 297, 311.) At the time the *Batson* motion was made, four black jurors had been selected, the State asked no questions and made no comments during *voir dire* to the veniremembers. The mere fact that some black veniremembers are challenged and others accepted by the State, without more, cannot be said to constitute even a pattern of such challenges. (*Garrett*, 139 Ill. 2d at 204, 564 N.E.2d at 791.) After a careful review of the record and relevant case law, we find that the circuit court's decision that defendant failed to establish a

*prima facie Batson* case is not against the manifest weight of the evidence.

Second, defendant argues that the circuit court improperly denied his two *pro se* post-trial motions without first appointing new counsel to prepare and present his allegations of ineffectiveness of counsel. Relying on *People v. Krankel* (1984), 102 Ill. 2d 181, 464 N.E.2d 1045, defendant contends that the circuit court erred by failing to consider his claim of ineffective assistance of counsel and by failing to appoint new counsel to investigate and present that claim. There is, however, no mandate that requires that new counsel be appointed whenever a post-trial motion includes an allegation of ineffectiveness of counsel. (See *People v. Morgan* (1991), 142 Ill. 2d 410, 568 N.E.2d 755.) After reviewing the factual matters underlying a defendant's claim, a circuit court determines whether the defendant's allegations regarding his counsel are meritless or simply pertain to trial strategy. If either of the two is true, then no new counsel needs to be appointed. *People v. Brandon* (1987), 157 Ill. App. 3d 835, 510 N.E.2d 1005.

■ After reviewing defendant's motion, we affirm the circuit court's finding. The circuit court found that the motion submitted by defendant is "really a retrial or reargument or relitigation of the motion to suppress and the trial." Further, the circuit court refused "to engage in a relitigation, retrial, rehearing on the motion." Defendant argued that his trial counsel failed to (1) investigate and call witnesses favorable to his defense, namely, Billy Scott, Willie and Henry Brown and Ray Robinson; (2) present evidence of Anthony Dandridge's bias against defendant; (3) impeach Roosevelt Dyes; and (4) impeach Assistant State's Attorney Thompson regarding a statement that defendant refused to be interviewed. As to the allegation that defense counsel failed to call witnesses favorable to defendant, the record is devoid of any reference to Scott or the Brown brothers. The record also indicates that Robinson was repeatedly subpoenaed to testify and that a contempt order and rule to show cause was entered against him. Defendant next claims that Dandridge was biased against him because Dandridge damaged defendant's car and owed defendant money. Defendant's motion did not indicate that he had informed his trial counsel of this possible bias. Defendant further argued that Dyes had motive to lie to protect his brother-in-law, Robinson. This argument of bias is refuted by Dye's unfavorable testimony about Robinson.

After reviewing defendant's allegations against his trial counsel, we find that he failed to show that his trial counsel's performance was seriously deficient so as to fall below the objective standard of

reasonableness. (*Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052.) There was, thus, no need to appoint defendant new trial counsel to investigate his post-trial motions. Accordingly, we hold that the circuit court properly denied defendant's post-trial motion.

Third, defendant argues that the State's opening remarks concerning the stages of a death-penalty trial and closing argument regarding decedent's injuries constitute prosecutorial misconduct. During the opening statement, the State commented:

> "Now, what we are beginning today, the trial is the first part of a three part process that has been designed to arrive at justice in the matter. The first part is the trial. The second and third part[s] are the parts that deal with sentencing.
>
> * * *
>
> It is all part of one process in effect but at this time I would ask you please to just concern yourself with what you are to deal with now which is just the guilt or innocence of this defendant, Eugene Rhoiney, and I'd ask you at this time to base that determination on the evidence that you will be hearing."

Defendant argues that the above statements suggest that a "trial was a mere formality to the death penalty procedure." Defense counsel, however, also remarked in his opening statement:

> "You heard the judge yesterday ask you questions about your opinion about the death penalty. That was asked for one reason, to get your feelings about it. Just like about your background, etcetera. You heard the State's Attorney tell you that this is the first of the three phases and that should you find Eugene Rhoiney guilty of murder it will continue to a second and third phase having to do with the death penalty."

Immediately after opening statements, the circuit court stated:

> "Again, to reiterate, what the lawyers just mentioned to you, jurors, this is the trial and this is the trial as to guilt or innocence and at this trial, this first phase or stage of the proceedings, only guilt or innocence is involved."

■ Relying on *People v. Barrow* (1989), 133 Ill. 2d 226, 549 N.E.2d 240, defendant claims that the State's opening statement amounted to prejudicial error. *Barrow* is distinguishable from the case at bar. In *Barrow* the Illinois Supreme Court found the circuit court's remarks to be improper because the judge stated that the jury would be asked to deliberate on the death penalty, without making it clear to the jurors that they first must find the defendant guilty of first-de-

gree murder. (*Barrow*, 133 Ill. 2d at 260, 549 N.E.2d at 254-55.) In the instant case, each attorney and the circuit court informed the jury that the particular part of the trial in which they were presently involved was to determine the guilt or innocence of defendant. Additionally, we note that the Illinois Supreme Court in *Barrow* found that the circuit court's comments were not so prejudicial as to deny defendant a fair trial. (*Barrow*, 133 Ill. 2d at 260, 549 N.E.2d at 255.) We agree with the circuit court's finding that the State's opening statement did not constitute error.

■ Defendant also argues that the State's closing argument concerning how decedent sustained his injuries was reversible error. In order to amount to reversible error, there must be a showing of substantial prejudice to defendant's rights. (*People v. Buchanan* (1991), 211 Ill. App. 3d 305, 570 N.E.2d 344.) The State's remarks were based on reasonable inferences drawn from the facts adduced at trial and were made for the purpose of establishing defendant's intent to commit first-degree murder; thus, we hold that the remarks were proper. See *People v. Franklin* (1990), 135 Ill. 2d 78, 552 N.E.2d 743.

■ Since defendant had a prior murder conviction, he was sentenced to a term of natural life imprisonment without parole. (Ill. Rev. Stat. 1985, ch. 38, par. 1005—8—1(a)(2).) The statute provides that if a defendant has previously been convicted of murder under any State or Federal law or is found guilty of murdering more than one victim, the court shall sentence the defendant to a term of natural life imprisonment. Defendant argues that this statute violates the eighth and fourteenth amendments of the United States Constitution because it mandates a natural life sentence, thereby precluding consideration of factors in mitigation. The Illinois Supreme Court has held that the mandatory natural life provision was valid under both the Federal and State constitutions. (*People ex rel. Daley v. Strayhorn* (1988), 119 Ill. 2d 331, 518 N.E.2d 1047.) Defendant's argument, therefore, is meritless.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County are affirmed.

Affirmed.

MANNING, P.J., and O'CONNOR, J., concur.