Lowy, J.
NATURE OF THE PROCEEDINGS
On July 9, 2001, Susan Almeida (“Susan”) as administratrix of the estate of her daughter Adryanna Olivier (“Adryanna”), brought a wrongful death action against her parents and Adryanna’s grandparents, Gilberto and Leontina Almeida (“grandparents”). The grandparents, along with Adryanna’s Aunt, Zita Almeida (“Zita”), were acting as foster parents to Adryanna when she died. Adryanna’s death allegedly resulted from injuries caused by a near drowning at her grandparents’ swimming pool on July 9, 1998.[1]
Plaintiff, Merrimack Mutual Fire Insurance Company (“Merrimack”), brought this action against the grandparents and Susan as Administratrix (collectively referred to as “the defendants”), seeking a declaratory judgment regarding the terms of an insurance policy it issued covering the grandparents’ home (“the policy”). Specifically, Merrimack seeks a declaration that the policy provision excluding coverage for “an insured” within the grandparents’ household bars recovery against it for Adryanna’s injuries.
Merrimack now seeks summary judgment as to the same issue. The material facts are undisputed. The issue before the court is whether Adryanna was an insured member of the household. Because this Court concludes that Adryanna was an insured resident of her grandparents’ household, and therefore not covered by the policy, Merrimack’s motion for summary judgment will be ALLOWED.
FACTUAL BACKGROUND
In January 1998, following a drug raid in Susan’s home, the Massachusetts Department of Social Services (“DSS”) removed Adryanna and her brothers (“the children”) from Susan’s custody. By the end of that month, the children were in the custody of Adryanna’s maternal grandparents, Gilberto and Leontina Almeida, and her maternal Aunt, Zita Almeida. The Almeidas assumed custody of the children pursuant to a DSS care and protection petition. The arrangement was formalized in “An Agreement Between the Massachusetts Department of Social Services and Foster Parents.” That agreement required Adryanna’s grandparents, with Zita’s help, to provide the children a “safe, nurturing, and stable environment” and to promote their grandchildren’s “physical, mental, and emotional well-being.” At all times, DSS’ hope was to reunite the children with Susan eventually.
Despite that goal, as indicated in the “DSS Family Resource Assessment Narrative,” the Almeidas “love[d] their grandchildren and w[ould] care for them as long as need be.” Indeed, the Almeidas were “committed to providing a permanent home for the children.” Not surprisingly, considering that Adryanna’s sister Alycea was already living with them without any official intervention, DSS considered the Almeidas “a very close family [who were] happy to have the children in their home.”
Tragically, on July 16, 1998, nearly seven months after she moved in with her grandparents, Adryanna died allegedly as a result of a swimming pool accident at her grandparents’ home. At the time of her death, DSS had no definite plan to terminate the foster care relationship with the Almeidas. No date had been set to reunite Adryanna and Susan, and the next scheduled district court review date was more than a month away, on August 27, 1998. A DSS “Foster Care Review Report” dated June 26, 1998, less than a month before the accident, indicates that Susan had made “insufficient progress toward the goal of reunification. [Susan] needs to engage in substance abuse services and improve her parenting skills before being reunified with her children.” That same report, while continuing DSS’ commitment to reunification, did not set a firm date for that event. Rather, DSS merely projected that reunification would occur by December 1998. Even if that date proved accurate, Adryanna would have been living with her grandparents for nearly a full year.
During the relevant time period, Adiyanna’s grandparents were covered by a homeowners insurance policy issued by Merrimack. That policy excluded coverage for “ ‘bodily injury’ to . . . ‘an insured.’ ” As defined by the policy, an insured includes “residents of [the grandparents’] household who are . . . relatives or . . . [o]ther persons under the age of 21 and in the care of any person named above." Merrimack asserts that Adryanna is insured under the policy and that coverage for her injuries is therefore excluded.
DISCUSSION .
Summary judgment shall be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Mass.R.Civ.P. 56(c); Cassesso v. Comm’r of Correction, *304 390 Mass. 419, 422 (1983); Cmty. Nat’l Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Exclusions for the coverage for bodily injuxy to an insured are generally valid and enforceable. See Hahn v. Berkshire Mut Ins. Co., 28 Mass.App.Ct. 181, 185 (1989). The determinative issue is whether Adiyanna was a resident, and therefore an insured, under the policy. If she was not, then Merrimack is bound to cover her injuries. If she was, then coverage is excluded. This is a question of law. See Vaiarella v. Hanover Ins. Co., 409 Mass. 523, 526 (1991) (citing Marlow v. New Bedford, 369 Mass. 501, 508 (1976); Cavanaugh v. DiFlumera, 9 Mass.App.Ct. 396, 397 (1980)).
Whether Adryanna was an insured turns upon whether she was a resident of her grandparents’ home. The defendants assert that the policy term “resident” is ambiguous and, therefore, must be construed against the insurer. Interstate Gourmet Coffee Roasters, Inc. v. Seaco Ins. Co., 59 Mass.App.Ct. 78 (2003). While it is true that there is no fixed meaning for the term “resident” in eveiy context, Vaiarella, 409 Mass, at 527-28, in this case, the meaning is clear. “When construing undefined words in an insurance policy, a court must give the words used in the contract their plain and ordinary meaning.” Prudential Prop. & Cas. Ins. Co. v. LaMarr, 92 Ohio App.3d 331, 334, 635 N.E.2d 63, 64 (Ohio App. 9 Dist. 1993). Residence is defined as “[t]he act or fact of living in a given place for some time.” Black’s Law Dictionary, 1310 ( 7th ed. 1999 ). The term is therefore unambiguous. Under this “plain meaning and common understanding of the word ‘resident,’ ” Adryanna was a resident of her grandparents’ household. LaMarr, 92 Ohio App. 3d at 334, 635 N.E.2d at 64. See also, Merchants Mut. Ins. Co. v. Artis, 907 F.Sup. 886, 890 (E.D.Penn. 1995); Jenks v. Louisiana, 507 So.2d 877 (La. 1987).
Determining whether an individual is a resident of a particular household for purposes of insurance coverage is subject to roughly the same analysis as determining whether that individual is a member of that household. See, e.g., Annot., Who is a “Member” or “Resident” of Same “Family” or “Household” Within No-Fault Or Uninsured Motorist Provisions of Motor Vehicle Insurance Policy, 66 A.L.R.5th 269 (1999). “There is no bright line test for the determination of a claimant’s status as a household member.” Gianely v. The Travelers Ins. Co., 1995 Mass.App.Div. 155, 156 (1995) (citing Vaiarella, 409 Mass, at 526-27 (1991)). However, the issue may be resolved by weighing the following four factors; (1) the nature of the relationship between the claimant and the named insured; (2) the claimant’s physical presence in the insured home; (3) the claimant’s financial dependence on the named insured; and (4) the intentions of the claimant and the named insured for the claimant to remain in the insured dwelling for a substantial period of time.[2] When applying this test, “no one [factor] is controlling, but all... must combine to a greater or lesser degree.” Farmers Ins. Co. of Arizona v. Oliver, 154 Ariz. 174, 178, 741 P.2d 307, 311 (Ariz. 1987); Easter as next friend of M.D.E. v. Providence Lloyds Ins. Co., 17 S.W.3d 788, 791 (Tex. 2000). Each of these relevant factors is discussed, in turn, below.
The nature of the relationship between the named insured and the claimant in this case argues in favor of Adiyanna’s status as a resident. The Almeidas were responsible, as foster parents, for the care and support of Adryanna. This alone might be sufficient to find Adiyanna a resident.[3] The Almeidas’ status as foster parents through DSS, however, does not begin to describe or encompass the relationship. The Almeidas were Adiyanna’s blood relatives. They were part of the same close family. Adiyanna was not simply placed in a foster home; rather, she and her siblings were living with their aunt and grandparents. Particularly considering the fact that Alycea was already living in the grandparents’ home, the relationship between Adiyanna and the Almeidas was based more on their membership in the same family than it was on any DSS intervention or administration.
The second factor, physical presence, also supports Adiyanna’s status as resident. She was indisputably physically present in her grandparents’ home. She was living with her grandparents, her aunt, and her siblings in the insured household for nearly seven months preceding the tragic accident. Moreover, Adryanna was injured in an accident at her grandparents’ home. See Oliver, 154 Ariz. at 178, 741 P.2d at 311 (considering the “individuals presence in, or absence from, the named insured’s home on the date of the occurrence” in determining residency status).
The record is not sufficiently developed to determine definitively whether the Almeidas or DSS were responsible for Adryanna’s economic support. The third factor, therefore, is ambiguous. However, the agreement that Adiyanna’s grandparents signed with DSS requires the grandparents to physically support Adiyanna. Therefore, evidence weighing on this factor also appears to support Adryanna’s residency status.[4]
*305 The fourth and final factor, the intentions of the parties regarding the permanence of the relationship, also argues in favor of Adiyanna’s residency status. Residency status does not require an intent by either the insured or the individual to remain permanently in the household. Indeed “ ‘[r]esident’ may be interpreted ‘to include relatives who periodically stay in the home indefinitely.’ ” Apodaca v. Farmers Ins. Co. Of Arizona, 134 N.M. 188, 75 P.3d 404, 407 (N.M. 2003) (quoting Vanguard Ins. Co. v. Racine, 224 Mich.App. 229, 568 N.W.2d 156, 159 (Mich.App. 1997)). However, although true that “permanency is not required!,] [sjtill, something more is required than a mere temporary sojourn.” A.G. by Waite, 112 Wis.2d at 21, 331 N.W.2d at 645.
Adryanna’s stay with the Almeidas was no mere sojourn. She had lived with the Almeidas for nearly seven months, along with her sister and two brothers, before she died. There was no certain date set for Adiyanna to reunite with Susan. Even the tentative date for reunification in December, had all gone well, would have resulted in Adiyanna living with the Almeidas for nearly a full year. The Almeidas were legally responsible for her physical and emotional support. Moreover, they were committed to providing Adiyanna with a permanent home, and were happy to care for her as long as necessary.
Although both the Almeidas and DSS hoped to reunite Adiyanna with her mother, that Adiyanna might eventually leave the Almeidas care can hardly be dispositive. Naturally, few biological, adoptive, or foster parents, whatever their warmest hopes, expects that their children will continue to live in their home forever. Yet, most would undoubtedly be alarmed to find that the children with whom they share a home were not covered under their homeowners insurance policy.
Thus, the nature of the relationship between Adryanna and the Almeidas, Adiyanna’s physical presence in the Almeidas’ home, and the substantial intended duration of the relationship each favor finding Adryanna to be a resident of the Almeidas’ household. Considering that the factors should be taken as a whole, this is sufficient to conclude that Adiyanna was a resident and that she is, therefore, excluded from recovering under the policy.[5] Indeed, if Adryanna was not a resident of the Almeidas’ household, it is difficult to conceive of where she was a resident.
Moreover, cases such as this one turning upon the residency status of a child in the insured’s household “become[ ] a two edged sword; and neither the insurance companies nor the insureds should be able to fence with both sides of it.” Jenks, 507 So.2d at 880 (quoting A.G. by Waite, 112 Wis.2d at 26, 331 N.W.2d at 647). Considering a hypothetical “situation!] in which [Adiyanna] committed a tortious act upon a third party, the resolution in favor of coverage would compel the insurance company to defend the insured foster parents.” Jenks, 507 So. 2d at 880. That is, finding Adiyanna an insured under the policy would presumably require Merrimack to cover any harm she might cause to a play-date, for example, visiting the Almeidas’ home. Finding that Adiyanna is not an insured would result in no coverage for such a third-party injury. Based on the nature of their relationship with Adiyanna and the substantial and indeterminate duration of her stay, it is likely that the Almeidas’ intent and understanding would be that their insurance would cover such injuries. See Jenks, 507 So.2d at 879-80.
Finally, the case at bar is distinguishable from New London County Mut. Ins. Co. v. Mathews, 1999 WL 1319186 (Mass. Super. 1999) (Cratsley, J.), relied upon by the defendants. In that case an eight-year old child, Mathews, who was living with his grandmother was similarly injured in a swimming pool accident. Mathews and his mother were living at the grandmother’s home while they searched for a new apartment after their home had been burglarized. All evidence pointed to a clear intent that Mathews and his mother would leave shortly— as soon as they found a new apartment. In fact, Mathews’ mother “left all of her furniture and many of her personal belongings in storage. If she had intended for the arrangement to be more permanent, she certainly would have found room in the home for all of her personal effects or, alternatively, she would have sold them.” Mathews, 1999 WL 1319186 at **3. At all times, Mathews and his mother remained financially independent of the grandmother. Mathews was held not to be an insured under the applicable policy because he “did not intend to reside in the . . . house permanently, . . . was not financially dependent on [his grandmother], and [his grandmother] did not have a legal obligation to support Mathews.” Mathews, 1999 WL 1319186 at **4.
The relationship in this case is of a fundamentally different nature. In Mathews, the child’s mother voluntarily moved, together with the child, into the grandmothers’ home. Indeed, the mother had stored all of her belongings and was actively searching for a home to move into in the near future. Here, Adiyanna was removed from Susan’s home and care by DSS after a drug raid in Susan’s apartment. Furthermore, unlike Mathews, Adryanna’s stay at her grandparents’ home was of an indefinite duration and the Almeidas were legally obligated to support her. Given all of these factors, the Almeidas were likely to consider insurance coverage for Adiyanna, while Mathews’ grandmother might not.
Thus, after determining that three of the four relevant factors argue in favor of residency status, and that the fourth is ambiguous; considering the unpalatable ramifications with respect to third parties of *306 holding Adiyanna not to be a resident; and distinguishing Mathews; this Court concludes that Adiyanna was a resident and an insured under the policy, and as such recovery for her injuries is excluded.
ORDER
For the reasons set forth above, it is hereby ORDERED that the Plaintiffs motion for summary judgment is ALLOWED.

Together, Zita and Adiyanna’s grandparents will be referred to as “the Almeidas.”

“While the 'relevant factors’ employed by courts in this Commonwealth as well as in other states seem as endlessly varied as the fact patterns of the cases in which they are applied, the predominant considerations include the nature of the claimant’s relationship to the named insured, the individual’s physical presence in or absence from the named insured’s dwelling place, the degree of the individual’s economic dependence upon the named insured, and the intention of the named insured and the claimant with respect to the permanence of the latter’s living arrangements.” Gianely, 1995 Mass.App.Div. at 156-57. See also New London County Mut Ins. Co. v. Mathews, 1999 WL 1319186, **3 (Mass. Super. 1999) (Cratsley, J.).

See, e.g., A.G. by Waite v. Travelers Ins. Co., 112 Wis.2d 18, 331 N.W.2d 643 (Wis. 1983) (holding that a foster child expecteded to live with the named insured for one year is an insured resident); Easter as next friend ofM.D.E., 17 S.W.3d 788 (holding that a foster child who lived with the named insured for five months is an insured resident); LaMarr, 92 Ohio App.3d 331, 625 N.E.2d 63 (holding that a foster child who lived with the named insured for six months with no definite termination date was an insured resident); Merchants Mut Ins. Co. v. Artis, 907 F.Sup. 886 (E.D.Pa. 1995) (holding that a foster child who lived with the named insured for nine months with no set termination date was an insured resident); Allstate Ins. Co. v. Thom, 2001 WL 1523847 (Mich.App. 2001) (holding a foster child who had lived with the named insured for eleven months was an insured resident); State Farm Mut Ins. Co. v. Breazell, 324 S.C. 228, 478 S.E.2d 831 (S.C. 1996) (holding that a foster child who had lived with the named insured for twenty months, who was placed for an indefinite period of time, and who was treated as part of the family was a resident insured). But see County Mut Ins. Co. v. Watson, 1 Ill.App.3d 667, 274 N.E.2d 136 (Ill.App.2d Dist. 1971) (holding that a foster child is not a resident within the meaning of an insurance policy).

Because neither party sufficiently developed the record in this respect, this Court cannot make a definitive determination on this factor.

Although Adiyanna’s financial dependence upon the Almeidas is not certain, as noted above there is evidence that it, too, supports finding Adiyanna to be a resident. Namely, the agreement the Almeidas signed with DSS required the grandparents to physically support Adryanna. Moreover, as noted above, the factors are taken as a whole with no one factor controlling. Oliver, 154 Ariz. at 178, 741 P.2d at 311; Easter as next friend. of M.D.E., 17 S.W.3d at 791.